In the Matter of The NEW POWER COMPANY, a/k/a EMW Marketing Corp., a/k/a Columbia Energy Services, New Power Holdings, Inc., a/k/a EMW Energy Services Corp., a/k/a TNPC, Inc., TNPC Holdings, Inc., a/k/a EMW Holdings Corp., Debtors.

Nos. 02–10835–WHD to 02–10837–WHD.

United States Bankruptcy Court,
N.D. Georgia,
Newnan Division.

July 16, 2004.

Robert J. Mottern, Weizenecker, Rose, Mottern & Fisher, P.C., Atlanta, GA, Craig H. Averch, White & Case, LLP, Los Angeles, CA, for Automated Power Exchange.

Richard W. Havel, Sidley, Austin, Brown, & Wood LLP, Los Angeles, CA, Paul K. Ferdinands, King & Spalding, Atlanta, GA, Geoffrey T. Raicht, Sidley, Austin, Brown & Wood LLP, New York, NY, for Debtors.

## ORDER

W. HOMER DRAKE, JR., Bankruptcy Judge.

Before the Court is the Application of Automated Power Exchange (hereinafter "APX") for Payment of Attorneys' Fees and Expenses. An objection to the Application has been filed by New Power Company (hereinafter "New Power"), New Power Holdings, Inc., and TNPC Holdings, Inc. (collectively referred to herein as the "Debtors"). This matter constitutes a core proceeding over which this Court has subject matter jurisdiction. *See* 28 U.S.C §§ 157(b)(2)(B); 1334.

On June 11, 2002, the Debtors filed voluntary petitions under Chapter 11 of the Bankruptcy Code. These cases were administratively consolidated on June 12, 2002, and an Official Committee of Unsecured Creditors (hereinafter the "Committee") was appointed for New Power on June 18, 2002.

New Power is the operating entity through which the Debtors provided gas and electric service to customers in various states, including Georgia, Texas, Ohio, and Pennsylvania. Throughout the case, the Debtors have continued to operate as debtors-in-possession and have worked toward the liquidation of the Debtors' assets. The asset sales, the bulk of which were concluded prior to the end of July 2002, produced funds sufficient to pay all creditors in full, with interest.

APX is an independent transaction processing service provider for wholesale electric power markets. APX and New Power were parties to a Master Service and Participation Agreement (hereinafter the "MSPA"). New Power did not assume the MSPA. Accordingly, pursuant to the Debtors' Second Amended Plan, the MSPA was deemed rejected as of the Effective Date of the Plan, which was March 11, 2003.

Under the MSPA, APX provided scheduling services to New Power in connection with New Power's servicing of Texas customers. The Texas market is managed and administered by the Electric Reliability Council of Texas (hereinafter "ERCOT"). Pursuant to the MSPA, APX acted as New Power's Qualified Scheduling Entity. New Power provided data regarding its power needs to APX, which APX in turn submitted to ERCOT. ERCOT generated several successive statements regarding New Power's use of energy and

provided weekly settlement invoices to APX. APX remitted the amounts due to ERCOT on behalf of New Power and subsequently billed New Power for these amounts by way of a monthly invoice. The MSPA also obligated New Power to pay APX certain fees for its services.

APX contends that, following the filing of the Debtors' bankruptcy petitions, New Power asked APX to continue to act as its scheduling coordinator throughout the time period in which New Power would be winding down its operations in Texas. At that time, New Power anticipated that its retail customers would be transferred to another service provider. This transition process was completed at the end of September 2002.

At the time of the filing of the bankruptcy petitions, APX asserted a pre-petition claim for $2,199,565.98. APX also contends that New Power defaulted upon its post-petition obligations under the MSPA, resulting in a $1,199,090.17 administrative expense claim. APX filed one proof of claim (# 912) for the pre-petition and post-petition amounts that APX had already remitted to ERCOT on New Power's behalf and a separate proof of claim for $1,914,017.80, which represented: 1) amounts arising from a demand by ERCOT that APX increase the amounts posted in its Margin Account; 2) additional, estimated post-petition ERCOT charges; and 3) estimated legal fees.

On March 24, 2003, the Debtors objected to the APX proof of claim, asserting that the amounts billed by ERCOT were inaccurate, and asked the Court to adjourn a hearing on the claim objection until after the ERCOT Resettlement Process had been completed. The Court set this objection for a hearing on April 25, 2003. On March 28, 2003, APX filed: 1) a motion to compel payment of the undisputed portion of its claim, or, in the alternative, to convert the Debtors' bankruptcy cases to Chapter 7; 2) a motion for relief from the automatic stay to allow APX to setoff the cash collateral against amounts owed to APX; and 3) a response to the Debtors' objection to its claim. On April 22, 2003, the Debtors, APX, and the Committee met to discuss a resolution of APX's claims. On April 25, 2003, the Court approved a stipulation between APX and the Debtors. Pursuant to the stipulation, the automatic stay was lifted to allow APX to set off up to $1,535,704.99 against cash collateral, and the hearing on the Debtors' claim objection was adjourned. Additionally, APX's motion to compel or, in the alternative, convert the Debtors' cases, was deemed withdrawn without prejudice.

On June 25, 2003, at the direction of and on behalf of New Power, APX requested a formal Alternative Dispute Resolution, pursuant to Part 20 of the ERCOT protocols, in order to resolve New Power's billing dispute with ERCOT.[1] On August 6, 2003, the parties entered a Stipulation and Consent Order, under which New Power agreed to advance to APX 90% of the ERCOT charges actually paid by APX on New Power's behalf, valid and unpaid APX fees, and post-petition interest as provided for under the Debtors' Plan. The parties also agreed to a procedure for resolving additional disputes over future ERCOT charges. Subsequently, New Power paid APX $3.4 million in full satisfaction of its claim.

APX employed the law firms of White & Case LLP and Weizenecker, Rose, Mottern, and Fisher to represent it throughout

---

1. New Power agreed to indemnify APX for any damages or losses incurred in connection with the ADR, including reasonable attorneys' fees and expenses. Accordingly, this application does not seek payment of fees incurred in connection with the ADR.

the Debtors' bankruptcy proceedings. APX seeks reimbursement from the Debtors' estates for $93,692.70 in legal fees and $4,068.47 in expenses incurred in connection with the Debtors' cases. APX asserts that these fees are properly payable by the Debtors' estates as either an administrative expense claim or as part of the unsecured claim of APX. The Debtors have objected to the payment of the fees in any manner.

## Conclusions of Law

### A. *Payment of Attorneys' Fees Pursuant to Section 503(b)(3)(D)*

APX first contends that it is entitled to have its legal fees and expenses reimbursed by the Debtors' estates because it made a substantial contribution to the bankruptcy cases. As the Debtors have noted, as a general rule, each party to a litigation must pay its own fees and expenses. However, in the bankruptcy context, if a creditor or other party makes a substantial contribution to a bankruptcy case, the Code provides for payment of the party's expenses as an administrative expense by the estate. *See* 11 U.S.C. 503(b)(3)(D); *Matter of D'Lites of America, Inc.,* 108 B.R. 352 (Bankr.N.D.Ga. 1989) (Drake, J.). The party seeking payment of an administrative expense claim under § 503(b)(3)(D) bears the burden of proving that the "expenses resulted in a significant and tangible benefit to the estate." *D'Lites,* 108 B.R. at 356. The simple fact that the expenses were incurred, without proof of a "concrete benefit to the estate," is insufficient to satisfy this burden. *Id.* The Court will not allow the payment of expenses if it concludes that the claimant's participation in the case "as a whole was detrimental to the estate," or "caused an adverse impact on the estate rather than a 'substantial contribution' as required by § 503(b)(3)(D)." *Id.* For ex-

ample, notwithstanding a finding of extensive involvement in a case, the Court is unlikely to find a substantial contribution when the movant's participation has retarded or interrupted the debtor's reorganization. *See In re DP Partnership,* 106 F.3d 667, 672 (5th Cir.1997); *In re Communications Management & Information, Inc.,* 172 B.R. 136, 141 (Bankr.N.D.Ga. 1994) (Murphy, J.); *see also In re Big Rivers Elec. Corp.,* 233 B.R. 739 (W.D.Ky. 1998). (denying application for payment of expenses after finding that, although some of the applicant's activities may have benefitted the estate, any benefit was outweighed by the costs associated with the applicant's attempts to interrupt and delay the bankruptcy proceedings).

The Court recognizes that "the motive of the petitioner should not be a factor in determining whether a substantial contribution has been made in the bankruptcy proceeding." *In re Celotex Corp.,* 227 F.3d 1336, 1339 (11th Cir.2000). The fact that the movant performed services or incurred expenses primarily to benefit its own interest rather than that of the estate or the creditors at large is irrelevant to the question of whether the movant has made a substantial contribution to the case. Nonetheless, when a creditor acts primarily for its own benefit, the evidence may show that the movant's participation resulted in a primary benefit to the creditor and only an incidental benefit to the estate. In such a case, the contribution made is not "substantial" within the meaning of the statute. *In re Kidron, Inc.,* 278 B.R. 626 (Bankr.M.D.Fla.2002).

In this case, APX argues that it made a substantial contribution to the Debtors' bankruptcy estates by helping New Power to resolve its issues with ERCOT without having to resort to costly and time-consuming litigation. APX contends

that it voluntarily educated the Debtors and the Committee about ERCOT and its complex settlement procedures and assisted the Debtors through the "protracted ERCOT settlement process." Specifically, APX submits that: 1) it used its marketing clearing account to shield New Power from the effects of an increased ERCOT margin call for three months; 2) it made a special trip to New York City to educate the Committee about the nature of the ERCOT resettlement process; 3) it assisted the Debtors' financial experts in recovering their "root ERCOT data" from the prior year and showed them how the data correlated to existing data; and 4) provided New Power with weekly invoices to allow the Debtors to track on-going, changing exposure, caused by ERCOT's decision to resettle the charges for the year 2002. Absent these services, APX contends, the Debtors would have had to engage in "costly and risky" litigation that could have derailed the progression of the Debtors' bankruptcy cases. Finally, APX asserts that only APX had the requisite expertise and contractual relationship with ERCOT to provide these services to the estates.

The Debtors object to the payment of fees incurred by APX on the basis that APX has failed to satisfy its burden of proving that it made a substantial contribution to these bankruptcy cases. First, the Debtors take issue with the contention that APX educated the Debtors and the Committee with regard to ERCOT and its resettlement procedures. The Debtors would instead characterize the meeting in New York as a settlement conference, at which APX made a presentation to the Committee in support of the merits of its claim. Second, the Debtors dispute APX's contention that it voluntarily provided the Debtors with invoices to track the Debtors' liabilities to ERCOT, as APX was obligated under the MSPA to provide the Debt-

ors with any information transmitted by ERCOT. Further, the Debtors insist that the provision of these invoices did not result in a significant benefit to the estate because it was the Debtors' employees who were responsible for reviewing the information. Third, the Debtors deny that APX's use of its marketing clearing account to shield the Debtors from certain charges actually benefitted the estates. The Debtors contend that these charges would have been disputed charges that the Debtors could not have been paid any earlier.

The relatively swift resolution of the Debtors' dispute with ERCOT would appear to have benefitted the estates. The Court is not in a position to estimate with any certainty the amount saved by the Debtors in terms of time or money. Although it seems clear that APX participated in the process of the resettlement of the Debtors' liabilities to ERCOT by providing certain data and invoices, the Debtors and the Committee also played substantial roles in this process. The Court has insufficient evidence in the record to find that APX's involvement was crucial to the end result. Additionally, on the record before it, the Court cannot conclude that the Debtors would have incurred almost $100,000 in dealing with ERCOT had it not been for the assistance provided by APX.

Having reviewed the time entries submitted by APX along with its Application, the Court agrees with the Debtors that APX's purpose in attending the April 22nd meeting was to reach a resolution of its claim. Imparting information regarding ERCOT to the Committee would appear to have been a by-product of this meeting, and the Court cannot rely upon this to justify the payment of $100,000 of fees by the estate. Similarly, the totality of the circumstances would suggest that APX's focus throughout the case was to protect

itself from any exposure to ERCOT. The bulk of the time entries indicate that APX spent most of its attorney time investigating ways to negotiate and settle its claims and strategies by which it could gain leverage with the Debtors and the Committee. The Court recognizes that APX's motivation should not be a bar to a finding that its actions resulted in a substantial contribution to the Debtors' cases. However, APX's motivation does tend to support the conclusion that any assistance that APX may have rendered to the Debtors in dealing with ERCOT was merely incidental. APX seems to be suggesting that it should be entitled to have its attorney's fees paid because it agreed to continue acting as the Debtors' QSE during the post-petition period. However, vendors and other service providers often agree to do business with debtors during the post-petition period without such a benefit. In short, there is simply insufficient evidence in the record to support APX's contention that its efforts, including the presentation made by APX to the Debtors and the Committee, provided a benefit to the estate that was not already being provided by the Debtors' own employees or consultants.

■■ Even if the Court were to find that the provision of data and invoices to the Debtors conferred a substantial benefit upon the estates, none of the time entries contain any references that suggest that any of the attorney time for which APX seeks reimbursement was spent in this regard. Accordingly, the Court could not conclude that the fees incurred by APX were actually and necessarily incurred in making this contribution, within the meaning of § 503(b)(3)(D). "This provision requires the bankruptcy judge to .... distinguish between expenses incurred in making a substantial contribution to the case and expenses lacking that causal connection, the latter being noncompensable."

*In re DP Partnership,* 106 F.3d 667, 673 (5th Cir.1997).

### B. *Payment of Attorneys' Fees as an Administrative Expense Pursuant to Section 503(b)(1)(A)*

■ APX next argues that its post-petition fees should be paid as an administrative expense claim, pursuant to § 503(b)(1)(A). APX contends that the Debtors encouraged APX to continue to provide services under the MSPA during the post-petition period and should, therefore, be liable for payment of any attorneys' fees APX incurred as a result of its post-petition performance of its obligations under the MSPA. APX relies upon *In re New York Trap Rock Corp.,* 137 B.R. 568 (Bankr.S.D.N.Y.1992) for the proposition that attorneys' fees may be awarded to creditors in cases in which the "creditor's right to attorney's fees and costs incurred during the pendency of the case is based upon a pre-petition agreement" and "the attorney's fees are incurred as a result of some post-petition action by the debtor under the agreement that induced the creditor to provide goods or services to the debtor post-petition." The Debtors contend that *New York Trap Rock* is distinguishable from this case because, in *New York Trap Rock,* the debtor had assumed the pre-petition agreement at issue, and, in this case, the Debtors have rejected the MSPA. The Court agrees with the Debtors, as it does not interpret *New York Trap Rock* as broadly as APX.

In *New York Trap Rock,* the debtor operated a cement plant. *New York Trap Rock,* 137 B.R. at 571. The debtor had entered a pre-petition agreement with a contractor to modernize the debtor's plant. The agreement provided that the contractor would subcontract out certain aspects of the project, but would not pay any of the subcontractors without the debtor's

prior written approval. The agreement also obligated the debtor to indemnify the contractor for "any loss, damages, fines or penalties, or any cancellation fees" suffered by the contractor due to nonpayment of the subcontractors. *Id.* On behalf of the debtor, the contractor entered a subcontract for structural and mechanical work at the plant. Post-petition, the debtor moved to assume the subcontract and to cure the defaults thereunder. Although the debtor was not originally a party to the subcontract, the bankruptcy court authorized the debtor to cure the arrearage and assume the subcontract. The cure was to be made in installment payments, as opposed to a lump sum payment. However, the debtor failed to make the cure payments, and the subcontractor filed suit against the contractor to collect the arrearage under the subcontract. *Id.* In response, the contractor requested that the debtor seek authority to assume the pre-petition construction contract and reimburse the contractor for legal fees and expenses incurred in defending against the subcontractor's suit. *Id.* at 572. The debtor did not move for authority to assume the pre-petition contract. *Id.*

The contractor moved for allowance of an administrative expense claim for reimbursement of its attorneys' fees. The court explained that the issue in the case was whether the debtor's pre-petition obligation to indemnify the contractor for its expenses "triggered a post-petition administrative expense claim in favor of [the contractor] because of the debtor's post-petition conduct." *Id.* The court stated that "[t]o qualify as an administrative expense, the claim must satisfy section 503(b)(1)(A), which accords administrative expense status for 'the actual, necessary costs and expenses of preserving the estate ... for services rendered after the commencement of the case.'" *Id.* (citing 11 U.S.C. §§ 503(b)(1)(A)). The court also noted that expenses will generally be enti-tled to priority treatment if "the right to payment arose from a post-petition transaction with the debtor estate rather than from a prepetition transaction with the debtor, and the conduct giving rise to the payment was beneficial to the estate of the debtor." *Id.* The court then applied a two-prong test to determine whether the expenses were entitled to payment in accordance with § 503(b)(1)(A): "(1) the claim must arise out of a post-petition transaction between the creditor and the trustee or debtor in possession and (2) the claim is allowable only to the extent the consideration supporting the claimant's right to payment was both supplied to and beneficial to the post-petition estate in the operation of the business." *Id.*

In applying the test, the court reasoned that the pre-petition contract between the debtor and contractor obligated the debtor to indemnify the contractor for losses, but the "fact that post-petition defaults by the debtor on the assumed [subcontract] may have triggered the debtor's prepetition obligation to indemnify [the contractor] for losses or damages does not mean that [the contractor's] contingent claim for indemnification was elevated and transformed into a post-petition administrative claim." *Id.* Although the court recognized that a pre-petition indemnification agreement could give rise to a contingent claim, the court concluded that the claim could not be considered to have arisen from a post-petition transaction with the debtor. *Id.* at 573 (citing *In re Hemingway Transport, Inc.,* 954 F.2d 1 (1st Cir.1992) for the proposition that a "prepetition lease containing an indemnification agreement with respect to attorney's fees does not give rise to a post-petition administrative expense claim merely because the lessor incurred post-petition legal expenses as a result of the debtor's post-petition use of the premises"). Further, the court stated that to

establish entitlement to administrative expense status, the contractor must establish that "the post-petition debtor in possession induced the claimant to incur the post-petition expenses or perform the post-petition services for which an administrative expense priority is claimed." *Id.* Because the debtor had not assumed the pre-petition contract, which contained the indemnity provision, the court concluded that the pre-petition contract, "without additional post-petition conduct by the debtor," could not form the basis for granting administrative expense priority to the contractor's claim for legal fees and expenses. *Id.*

Had the court ended its analysis at this point, the contractor would have failed the first prong of the test in that the contractor would not have established that its entitlement to payment of its legal fees arose from a post-petition transaction with the debtor. However, the court went on to explain that the fact that the debtor had assumed the subcontract and "chose to assume responsibility for continuing the construction work as a benefit to the estate and its creditors," distinguished that case from those cases in which the pre-petition agreement to indemnify was not assumed. Because the debtor assumed the subcontract, the debtor was now responsible for payment of all of the contractor's obligations under the subcontract. *Id.* Additionally, the court concluded that, under Texas agency law, the debtor was obligated to indemnify the contractor for any amounts that it actually paid towards a liability that arose from a transaction performed on the debtor's behalf. *Id.* at 574. "When the debtor assumed the [subcontract] for the benefit of the estate, such post-petition assumption also incorporated the implied obligation of a principal to indemnify its agent for obligations incurred by the agent in furtherance of the assumed contract." *Id.* Therefore, the obligation to indemnify was also entitled to administrative expense priority under § 503(b)(1)(A). *Id.* The court further explained that:

> [I]t was the post-petition debtor in possession that induced [the subcontractor] to perform the services under the [subcontract] which also gave rise to [the contractor's] expenses for which indemnification as an administrative expense are sought. The post-petition inducement of [the subcontractor's] services and [the contractor's] expenses were fueled by the debtor's assumption of the [subcontract], which is crucial to [the contractor's] claim for administrative priority. To determine the existence of the implied indemnity obligation under the assumed contract which gave rise to the inducement, reference must be had to the applicable state law, which in this case is Texas law. A principal's implied obligation under Texas law to indemnify its agent for expenses incurred in furtherance of the agency relationship was incorporated into the ˙ [subcontract] which the debtor assumed, thereby entitling [the contractor] to seek indemnification from the debtor as an administrative expense priority. The debtor could have protected itself from elevating [the contractor's] expenses to administrative priority status by simply not assuming the [subcontract] that [the contractor] entered into with [the subcontractor]. If the debtor wished to keep [the contractor] out of the post-petition picture with respect to the original [subcontract], it need only have entered into a new contract directly with [the subcontractor]. In such event, the new post-petition contract with the [subcontractor] would not have incorporated the prepetition claim and post-petition expenses associated with the [subcontract].

*Id.*

The reasoning and holding of *New York Trap Rock* do not support APX's claim.

The result of *New York Trap Rock* was dependent upon the fact that the debtor assumed the pre-petition subcontract. This assumption allowed the court to find the existence of a post-petition transaction that benefitted the bankruptcy estate. Had the court not found that the assumed subcontract contained an implied obligation to indemnify the contractor, the court could not have found that the contractor's right to the payment of fees arose from a post-petition transaction. This was important to the resolution of the claim because the only other basis for the debtor's obligation to pay those fees was contained within the pre-petition contract, which the debtor had not assumed.

In this case, the Debtors did not assume the MSPA, and it was deemed rejected. The MSPA is the only basis under which the Debtors are even arguably obligated to pay APX's attorneys' fees. Assuming that the Debtors had an obligation under the MSPA to reimburse APX for attorneys' fees, that obligation would have been a pre-petition obligation, and, as noted by the court in *New York Trap Rock*, the fact that the fees were incurred during the post-petition period does not elevate that obligation to the status of an administrative expense. APX can point to no post-petition transaction between the Debtors and APX that would entitle APX to payment of its attorneys' fees. Accordingly, APX cannot meet the test applied by the court in *New York Trap Rock* and is not entitled to payment of its attorneys' fees as administrative expense.

## C. Collection of Post–Petition Fees and Expenses as Part of the Unsecured Claim

Finally, APX argues that it is entitled to collect its reasonable attorneys' fees and expenses as part of its unsecured claim because it would have been entitled to recover these fees under the MSPA had the Debtors' bankruptcy case not intervened. In response, the Debtors argue that, unlike an oversecured creditor, an unsecured creditor is not entitled to the payment of post-petition attorneys' fees. Alternatively, the Debtors argue that, even if the Court were to determine that an unsecured creditor can collect post-petition fees and expenses as part of its unsecured claim, APX has no contractual or statutory right to do so.

### 1. Whether Unsecured Creditors Are Barred from Collecting Attorneys' Fees

■ A split of authority exists as to whether an unsecured creditor is entitled to payment of post-petition attorneys' fees as part of its unsecured claim. A majority of courts have held that, unlike a secured creditor, an unsecured creditor is not entitled to collect post-petition attorneys' fees or collection costs, notwithstanding the existence of a contractual or statutory right to do so. *See In re Hedged–Investments Associates, Inc.*, 293 B.R. 523 (D.Colo. 2003); *In re Loewen Group Intern., Inc.*, 274 B.R. 427 (Bankr.D.Del.2002); *In re Sakowitz, Inc.*, 110 B.R. 268 (Bankr. S.D.Tex.1989). As noted by the court in *In re Pride Companies, L.P.*, 285 B.R. 366 (Bankr.N.D.Tex.2002), the majority generally relies upon four arguments to support this proposition.

The first is the legal maxim of *"expressio unius est exclusio alterius,* meaning the expression of one is the exclusion of another." *In re Pride Companies, LP*, 285 B.R. 366 (Bankr.N.D.Tex.2002). Section 506(b) provides that oversecured creditors may collect attorneys' fees and costs as part of the secured claim. 11 U.S.C. § 506(b). The majority of courts have concluded that, if Congress intended for unsecured creditors to receive post-peti-

tion attorneys' fees, it would have said so as explicitly as it authorized oversecured creditors to collect such fees in § 506(b). Second, as the Debtors suggest, some courts have concluded that the United States Supreme Court's decision in *United Savings Association of Texas v. Timbers of Inwood Forest Assocs. Ltd.,* 484 U.S. 365, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988), supports a finding that unsecured creditors are not entitled to collect attorneys' fees from the bankruptcy estate. *See In re Loewen Group Intern., Inc.,* 274 B.R. 427 (Bankr.D.Del.2002). The court in *In re Loewen Group* noted that, "in *Timbers,* the Supreme Court concluded that because § 506(b) 'permits post-petition interest to be paid only out of the security cushion, the undersecured creditor, who has no such cushion, falls within the general rule disallowing post-petition interest.'" The *Loewen Group* court reasoned that this "rationale applies equally to claims for post-petition fees and costs." *Id.* Third, the majority decisions often point to § 502(b), which provides that the bankruptcy court "shall determine the amount of [a] claim as of the date of the filing of the petition," as support for the proposition that attorneys' fees incurred after the filing of the bankruptcy case may not be added to the creditor's unsecured claim. 11 U.S.C. § 502(b). Finally, the majority decisions rely upon the policy argument that payment of post-petition attorneys' fees to only those unsecured creditors with a contractual or statutory right to fees would be contrary to the bankruptcy system's "primary purpose" of bringing about "an equitable distribution of the bankrupt's estate among creditors holding just demands." *In re Pride Companies,* 285 B.R. at 373 (citing *In re Sakowitz, Inc.,* 110 B.R. 268, 271 (Bankr.S.D.Tex.1989)).

A significant minority of courts have held that nothing in the Code prevents an unsecured creditor from asserting an unse-cured claim for post-petition attorneys' fees to which the creditor has a contractual or statutory right. *See In re United Merchants & Mfrs., Inc.,* 674 F.2d 134 (2d Cir.1982); *In re Byrd,* 192 B.R. 917, 919 (Bankr.E.D.Tenn.1996); *Matter of 268 Ltd.,* 789 F.2d 674 (9th Cir.1986). Having considered the various arguments on this issue, the Court finds the reasoning of the minority more persuasive.

Sections 501 and 502 govern the allowance of claims filed against the bankruptcy estate. Section § 101(5)(A) broadly defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). Pursuant to § 502, when a proof of claim is filed, the claim will be deemed allowed unless a party in interest objects. *See* 11 U.S.C. § 502(a). In the face of an objection, the bankruptcy court must allow the claim unless one of nine specific exceptions applies. *Id.* § 502(b). The exception most often applicable provides that a claim shall be disallowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." *Id.* § 502(b)(1). Accordingly, the fact that a claim is contingent or unmatured is not grounds to disallow a claim unless that claim is for unmatured interest. *See* 11 U.S.C. § 502(b)(2); *see also In re Hemingway Transport, Inc.,* 954 F.2d 1, 8 (1st Cir.1992) ("The difficulty or impossibility of estimation no longer constitutes a legitimate basis for disallowing any prepetition right to payment as a 'claim' against the estate."). The Court finds nothing within § 502 that would require the disallowance of an unmatured claim for attorneys' fees.

Although § 502 directs the bankruptcy court to "determine the amount of such claim as of the date of the filing of the petition" and to allow the claim in such amount, § 502(c) provides that the court shall estimate for purposes of allowance of claims "any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." 11 U.S.C. § 502(c)(1). When a creditor's right to payment for fees exists pre-petition, the right to payment constitutes a "claim," within the meaning of § 101(5)(A), albeit an unliquidated, unmatured claim that may be estimated for purposes of allowance, if necessary, pursuant to § 502(c). So long as the right to collect the fees existed pre-petition, the fact that the fees were actually incurred during the post-petition period is not relevant to the determination of whether the creditor has an allowable pre-petition claim for the fees. *See In re Hemingway Transport, Inc.*, 954 F.2d 1 (1st Cir.1992) ("As most courts now recognize, the term 'claim' is broad enough to encompass an unliquidated, contingent right to payment under a prepetition indemnification agreement executed by the debtor, even though the triggering contingency does not occur until *after* the filing of the petition under the Bankruptcy Code."). Therefore, the Court does not agree with the reasoning of the majority decisions that § 502(b)'s requirement that the amount of the claim be determined as of the filing of the petition bars a claim for post-petition fees.

■ As to the majority's reasoning that § 506(b) prohibits the collection of post-petition attorneys' fees by undersecured creditors, this Court has previously considered this argument without actually deciding the issue. In *In re Homestead Partners, Ltd.*, 200 B.R. 274 (Bankr. N.D.Ga.1996) (Drake, J.), a secured creditor exercised its rights, pursuant to O.C.G.A. § 13-1-11, to collect a flat percentage of attorneys' fees upon the debtor's default. The debtor objected to the addition of the statutory attorneys' fees to the creditor's proof of claim because the creditor was not fully secured. The Court recognized that "post-petition fees and interest may be recovered as part of a secured claim if, and only if, that claim is oversecured." *Id.* at 276–77 (citing *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)). However, the Court also noted that "section 506(b) provides little guidance on ... whether creditors not capable of recovering post-petition fees or interest as a section 506(b) secured claim still may have them paid as a general unsecured claim." *Id.* at 277 (citing *In re United Merchants & Mfrs., Inc.*, 674 F.2d 134, 138 (2d Cir.1982)). For guidance as to the allowance of an unsecured claim, the Court turned to § 502. The Court noted that § 502(b)(2) provides that the bankruptcy court must disallow claims for unmatured interest. *Homestead Partners*, 200 B.R. at 277. However, the Court found none of the § 502(b) exceptions to be applicable to attorneys' fees and stated that "[o]ne, therefore, reasonably could conclude that statutory percentage-based claims for post-petition fees, such as those arising under O.C.G.A. § 13-11-1, may be presented via an unsecured claim, notwithstanding section 506(b)." *Id.* The Court noted that the use of the word "shall" within § 502 "would appear to demand that no such exception be inferred and that the pursuit of post-petition fees be permitted on an unsecured basis." *Id.* The Court assumed, *arguendo*, that the attorneys' fees could be allowed as part of the undersecured creditor's unsecured claim, but did not need to specifically determine the issue because the Court concluded that the steps taken to prefect the creditor's right

to collect the fees constituted an avoidable preferential transfer. *Id.*

The Court's earlier analysis in *Homestead Partners* is consistent with the Eleventh Circuit Court of Appeals' recent decision in *In re Welzel*, 275 F.3d 1308 (11th Cir.2001). In *Welzel*, an oversecured creditor sought payment of attorneys' fees pursuant to § 506(b). The bankruptcy court found a portion of the fees to be unreasonable, and therefore, not payable as a secured claim under § 506(b). The debtor argued that the claim should be disallowed in its entirety, but the creditor sought payment of the fees as an unsecured claim. In analyzing the issue, the court interpreted § 506 as a provision that merely determines which claims should be entitled to receive the preferential treatment accorded secured claims, and construed § 502 as the provision that determines whether a claim should be allowed or disallowed. *Id.* at 1317–18. The court concluded that the failure of the claim for attorney's fees to meet the reasonableness test of § 506(b) did not require the court to disallow the claim. It merely prevented the creditor from seeking payment of the fees from its collateral, ahead of the unsecured creditors. Accordingly, the court held that the bankruptcy court should have bifurcated the claim for statutory attorneys' fees into secured and unsecured portions. *Id.*

In its analysis of the issue in *Welzel*, the court employed the same reasoning used by this Court in *Homestead Partners*. The court recognized that the determination of whether the attorneys' fees are an allowable claim must be made with reference to § 502 and that the "entire claim to fees is allowable under § 502 as long as the exceptions in subsection (b) do not apply." *Id.* The court concluded that, because none of the § 502(b) exceptions applied, the creditor's "claim for its contractual attorney's fees passes muster

under § 502." This is consistent with this Court's assumption in *Homestead Partners* that § 506(b) does not preclude undersecured creditors from collecting contractually set attorneys' fees as an unsecured claim. Although § 506(b) allows preferential treatment to claims for attorneys' fees asserted by oversecured creditors, it does not necessarily follow that similar claims of unsecured creditors are not entitled to payment with less favorable treatment. *See also Blair v. Bank One, N.A.*, 307 B.R. 906 (N.D.Ill. 2004).

In further support of its conclusion that fees not entitled to secured status are still entitled to be paid as unsecured claims, the court explained that reading § 506(b) to disallow claims of secured creditors for attorneys' fees that are found to be unreasonable would "turn a basic principle of bankruptcy law on its head." *Welzel*, 275 F.3d at 1319. The court reasoned that

> "[u]nsecured creditors would be privileged over oversecured creditors ... in the area of contractually set attorney's fees. Not subject to § 506(b), unsecured creditors who desired to collect unreasonable contractual fees would have an allowed claim under § 502, while as oversecured creditors would have such fees disallowed entirely under § 506(b). This outcome would create an absurd result—unsecured creditors would be in a more protected position than a group of secured creditors."

*Id.* This statement indicates that the *Welzel* court assumed that an unsecured creditor with a contractual claim for attorneys' fees would be entitled to payment of such fees as an unsecured claim. *See Blair v. Bank One, N.A.*, 307 B.R. 906 (N.D.Ill. 2004) ("[E]very federal circuit court of appeals that has done so has held that such fees do not fall into any of the exception categories. *Id.; see, e.g., In re Welzel*, 275

F.3d 1308, 1318 (11th Cir.2001) .... ."). Otherwise, if § 506(b) is a bar to the collection of contractually set attorneys' fees by unsecured creditors, the Eleventh Circuit's concern about preferring unsecured creditors over oversecured creditors would be misplaced.

▮ Finally, unlike the majority of courts, this Court is not persuaded that the Supreme Court's decision in *Timbers* requires a finding that undersecured or unsecured creditors cannot assert an unsecured claim for post-petition attorneys' fees. In *Timbers,* the Court stated that, pursuant to § 506(b), secured creditors could be paid post-petition interest only out of the "security cushion." *Timbers,* 484 U.S. at 372–73, 108 S.Ct. 626. Consequently, only oversecured creditors are entitled to a claim for post-petition interest. *Id.* Some courts have concluded that the same rationale applies to a claim for attorneys' fees because attorneys' fees are also included within § 506(b). However, in concluding that undersecured creditors are not entitled to post-petition interest, the Court reasoned that an "undersecured creditor, who has no such [security] cushion, falls within the general rule disallowing postpetition interest." *Id.* As noted above, there is no exception within § 502(b) which would prevent the collection of attorneys' fees by a creditor who has a valid nonbankruptcy right to do so. The Court did not consider the issue of whether this same undersecured creditor, with a contractual right to attorneys' fees, could have filed an unsecured claim for those fees. It is this Court's position that the Supreme Court would analyze that is-sue just as the Eleventh Circuit Court of Appeals has in *Welzel* and would conclude that § 506(b) does not dispose of the question. Neither § 506(b) nor the *Timbers* decision bar unsecured creditors' from asserting a contractual or statutory claim for attorneys' fees as an unsecured claim.[2]

2. *Whether APX Has a Right to Payment of its Attorneys' Fees and Costs*

That being said, in order to allow APX to collect attorneys' fees and costs as part of its unsecured claim, the Court must find that APX has either a contractual or statutory right to collect such fees. APX contends that it is entitled to fees either pursuant to the terms of the MSPA or applicable state law.

▮ As to the MSPA, APX turns to the indemnification provision of the MSPA, which provides as follows:

> To the fullest extent permitted by law, [the Debtor] shall indemnify and hold harmless APX, its Affiliates, agents, officers and employees from any and all claims and expenses incurred by them to the extent caused wholly or in part by any act or omission by [New Power], its Affiliates, agents, officers or employees, except to the extent such claim is caused by the negligence or willful misconduct of APX. [New Power's] obligation to indemnify under this Section shall survive termination of the [MSPA], and shall not be limited in any way by amount or type of damages.

MSPA, Section 13.1. APX argues that the terms of the indemnification provision are

---

**2.** Even if the Court concluded that unsecured creditors may not generally seek payment of attorneys' fees as an unsecured claim, the Court would adopt, as APX urges, an exception for solvent debtors. *See In re Continental Airlines, Inc.,* 110 B.R. 276 (Bankr.S.D.Tex. 1989) (holding that allowing a solvent debtor to retain estate funds without paying attorneys' fees, to which the unsecured creditor would otherwise have been legally entitled outside of bankruptcy, would be unjust); *see also In re Carter,* 220 B.R. 411 (Bankr.D.N.M. 1998).

broad enough to include reimbursement of all costs incurred by APX in enforcing its rights under the MSPA, including attorneys' fees and expenses.

The Debtors do not agree that the MSPA's indemnification provision permits reimbursement of attorneys' fees, and take issue with the fact that the MSPA does not expressly state that attorneys' fees are recoverable. By way of comparison, the Debtors note that the later indemnification agreement, which the parties executed prior to APX's efforts to resolve the dispute with ERCOT, specifically states that the Debtors will indemnify APX for all losses, damages, costs, and expenses "(including reasonable attorneys' fees and expenses)." Indemnity Agreement, ¶ 4. The Debtors submit that APX clearly knew how to bargain for an indemnification provision that specifically provides for reimbursement of attorneys' fees, but did not do so in the MSPA. Further, the Debtors contend that, under California law, which is applicable to the MSPA,[3] attorneys' fees should not be reimbursed unless the parties explicitly provide for them.

The Debtors rely upon *Continental Heller Corp. v. Amtech Mech. Servs., Inc.*, 53 Cal.App.4th 500, 61 Cal.Rptr.2d 668 (1997), for the proposition that attorneys' fees must be expressly provided for within the agreement. In *Continental Heller Corp.*, the court stated that:

> Indemnity agreements are construed under the same rules which govern the interpretation of other contracts. Accordingly, the contract must be interpreted so as to give effect to the mutual intention of the parties. (Civ.Code, § 1636.) The intention of the parties is to be ascertained from the "clear and explicit" language of the contract. (Civ. Code, §§ 1638–1639.) And, unless given some special meaning by the parties, the words of a contract are to be understood in their "ordinary and popular sense." (Civ.Code, § 1644.) "In interpreting an express indemnity agreement, the courts look first to the words of the contract to determine the intended scope of the indemnity agreement." (*Smoketree–Lake Murray, Ltd. v. Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724, 1737[, 286 Cal.Rptr. 435]).

*Continental Heller Corp.*, 61 Cal.Rptr.2d at 670.

In *Continental Heller Corp.*, a general contractor and subcontractor entered an agreement under which the subcontractor was to perform certain work. The agreement contained an indemnification provision. As a result of the subcontractor's actions, the general contractor settled certain claims for damages asserted against it. The general contractor later brought a claim against the subcontractor for payment of the settlement amount, plus the costs and fees incurred in both defending against the claims and bringing the indemnification action. The issue before the court was whether the general contractor was entitled to recover the attorneys' fees incurred in the indemnification action, or whether the indemnification provision allowed only recovery of the attorneys' fees incurred to defend against the original claims that arose from the subcontractor's actions. *Id.*, 61 Cal.Rptr.2d at 672. After noting that the language of the indemnification agreement controlled, the court

---

**3.** Section 8.3 of the MSPA provides that the "MSPA shall be governed by, and interpreted in accordance with, the laws of the State of *California,* excluding any choice of law rule that directs the application of the laws of another jurisdiction, irrespective of the places of execution or of the order in which signatures of the parties are affixed or of the place of performance." MSPA, § 8.3 (emphasis in original). The parties appear to agree that California law is applicable to the Court's interpretation of the MSPA.

found that the indemnification agreement contained two specific provisions dealing with the recovery of losses, including attorneys' fees. The first provision required indemnification "from all loss, damage, etc., 'including attorney's fees' which 'arises out of or is in any way connected with the performance of work under'" the contract. *Id.* at 673. The court agreed with the subcontractor that, if this had been the only provision within the agreement regarding the recovery of fees, the general contractor would not have been "entitled to attorney fees incurred in prosecuting this action for breach of the indemnity agreement." However, the second provision required indemnification from "any and all loss, damage, costs, expenses and attorney's fees suffered or incurred *on account of any breach of the aforesaid obligations and covenants, and any other provision or covenant.*'" *Id.* (emphasis in original). The court concluded that the language of the second provision clearly referred to attorneys' fees incurred in any action for a "breach of any provision of the contract including, but not limited to, breach of the indemnity provisions." *Id.*

Like the court in *Continental Heller*, a significant number of courts have distinguished general indemnification provisions from more specific provisions that clearly address the reimbursement of fees incurred during litigation between the parties. These courts have determined that the broad language of standard indemnification provisions, although arguably broad enough to encompass attorneys' fees as losses or damages, do not contain specific language to support a finding that the parties intended to include payment of attorneys' fees arising from litigation between the contracting parties. *See Building Maintenance Service Co. v. AIL Systems, Inc.,* 55 Cal.App.4th 1014, 64 Cal.Rptr.2d 353 (1997) (rejecting the argument that an indemnification was

"broad enough to constitute an attorney's fee provision ... because it provides for the recovery of costs, including attorney's fees, for 'any claim arising for any reason or cause whatsoever' and which is 'related in any way to this Order'" and finding that the provision contained no language that indicated that the "contracting parties intended to address claims made against each other"); *Otis Elevator Co. v. Toda Construction,* 27 Cal.App.4th 559, 32 Cal.Rptr.2d 404, 406–07 (1994) ("Further, '[a] provision including attorney fees as an item of loss in an indemnity clause is not a provision for attorney fees in an action to enforce the contract.'"); *.92 Madison Ave., LLC v. Mulberry Thai Silks, Inc.,* 2003 WL 22203742 (S.D.N.Y. Sept.22, 2003) ("California case law has consistently rejected arguments that would read indemnity provisions as contractual agreements to permit fee shifting in litigation between the contracting parties"; "When California courts have decided to read indemnification clauses as ... applying to fees arising from litigation between the contracting parties themselves, they require additional language making that intention explicit."); *Zurich Ins. Co. v. Killer Music, Inc.,* 998 F.2d 674 (9th Cir.1993) (under California law, insurer was liable to pay attorneys' fees incurred as a result of its failure to defend insured, but was not liable to reimburse insured for attorneys' fees incurred in action to enforce the indemnity provision).

Having reviewed the indemnification language within the MSPA, the Court concludes that the provision is a standard indemnification provision that does not include language evidencing any intent between the parties to shift the payment of fees incurred by APX during litigation with the Debtors to establish APX's claim. APX has pointed to no other provision

within the MSPA that would require the Debtors to reimburse APX for attorneys' fees incurred during an action against the Debtors for a breach of the MSPA. Accordingly, under California law, the MSPA does not require the Debtors to reimburse APX for those fees.

▇ The Court also agrees with the Debtors that APX's claim for fees is not supported by statute. APX argues that Texas law applies to the issue of whether APX is statutorily entitled to attorneys' fees as the prevailing party in a contract dispute. Specifically, APX contends that Section 38.001 of the Texas Civil Practice and Remedies Code (hereinafter "Section 38.001") entitles APX to payment of its attorneys' fees. Pursuant to Section 38.001, a "person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for ... an oral or written contract." TEX. CIV. PRAC. & REM. CODE ANN. § 38.001. If Texas law is applicable, and the Court determines that APX asserted a valid claim and met the procedural requirements imposed by Section 38.001, APX would be entitled to an award of reasonable attorneys' fees.

The Debtors argue that California law, rather than Texas law, controls this issue. Unlike Texas law, California law has no statutory provision similar to Section 38.001. Section 1021 of the California Code of Civil Procedure provides that "[e]xcept as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties." CALIF. CODE OF CIV. P. § 1021. Section 1032 also provides for a recovery of "costs" by a prevailing party. *Id.* § 1032. However, the term "costs" includes attorneys' fees only where attorneys' fees are authorized by either contract, statute, or other law.

*See Id.* § 1033.5. "[R]ecoverable litigation costs do include attorney fees, but only when the party entitled to costs has a legal basis, independent of the cost statutes and grounded in an agreement, statute, or other law, upon which to claim recovery of attorney fees." *Santisas v. Goodin,* 17 Cal.4th 599, 71 Cal.Rptr.2d 830, 951 P.2d 399 (1998). In this case, APX has not presented any other statutory authority that would support a claim for attorneys' fees under which the Court could consider the fees to be "costs" within the meaning of Section 1032. Further, as discussed above, the MSPA does not provide APX with a contractual right to collect fees. Finally, the Court has been presented with no argument to support a finding that APX is otherwise entitled to fees under any other law. Therefore, if California law is applicable, the Court must find that APX is not entitled to recover its attorneys' fees.

▇ Because the application of California law, as opposed to Texas law, could lead to a different result, the Court must resolve the conflict of law issue. The first step in the conflicts of law analysis is to determine whether the issue is procedural or substantive for purposes of *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). "If the Court determines that the matter is substantive, it will examine the substantive law of the forum state, which includes its choice of law rules, to ascertain the applicable substantive law." *Pinkerton & Laws, Inc. v. Royal Ins. Co. of America,* 227 F.Supp.2d 1348, 1357 (N.D.Ga.2002) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477;) *see also McMahan v. Toto,* 256 F.3d 1120 (11th Cir.2001); *In re Bagley,* 6 B.R. 387 (Bankr.N.D.Ga.1980)

(Drake, J.).[4] "It is clear that statutes allowing for recovery of attorney's fees are substantive for *Erie* purposes." *Pinkerton & Laws, Inc.*, 227 F.Supp.2d at 1357. As to the interpretation of the contract itself, a Georgia court would apply the law of the state designated by the parties. *Kellogg v. Food Service Supplies, Inc.*, 246 Ga.App. 695, 541 S.E.2d 683, 684 n. 5 (2000) ("In the absence of contrary public policy, our courts normally will enforce a contractual choice of law provision, as the parties by contract may stipulate that the laws of another jurisdiction will govern the transaction."). Accordingly, if APX had filed suit against the Debtors in Georgia to recover the amounts due under the MSPA, the Georgia court would have applied the substantive law of California to interpret the contract. The Court is persuaded that, if a Georgia court were to conclude that, under California law, APX was entitled to prevail on its contract claim, a Georgia court would also apply California law to determine whether APX is entitled to a statutory award of attorneys' fees. *See Pinkerton & Laws, Inc.*, 227 F.Supp.2d at 1357 (holding that, because attorneys' fees statutes are substantive for

*Erie* purposes, a Georgia court would not apply Georgia's bad-faith litigation attorneys' fee statute "if the laws of some other state should be applied to the issues" in the case). This conclusion is consistent with that adopted by other courts. *See, e.g., El Paso Natural Gas Co. v. Amoco Production Co.*, 1994 WL 728816, *5 (Del. Ch. Dec.16, 1994) (holding that Texas law applied to the issue of whether the prevailing party in a contract dispute was entitled to attorneys' fees because the contract at issue provided for Texas law to apply); *Tensar Environmental Systems, Inc. v. GSE Lining Technology, Inc.*, 1999 WL 649624, *6 (Tex.App. Aug.26, 1999) (holding that, when the contract contains no choice of law provision, and the claimant has not sufficiently explained why another state's law should control, the court will refer to the same state's law used to determine the substantive issues).

The only argument that APX has made as to why Texas law should control this issue is that APX was merely acting as a middle man between the Debtors and ERCOT, and, therefore, the real dispute was between the Debtors and ERCOT. Accordingly, since the contract between ER-

4. The Court recognizes that, under binding precedent from the United States Supreme Court and the Fifth Circuit Court of Appeals, bankruptcy courts may not always be bound to apply the conflicts principles of the forum state. *See Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946); *Matter of Crist*, 632 F.2d 1226, 1229 (5th Cir.1980) ("When disposition of a federal question requires reference to state law, federal courts are not bound by the forum state's choice of law rules, but are free to apply the law considered relevant to the pending controversy."). However, in this particular case, the Court finds it appropriate to apply the choice of law principles of the forum state, as the issue involved is one that could have been raised by APX outside of bankruptcy had the Debtors' bankruptcy case not intervened. Additionally, following its decision in *Crist,* the Fifth Circuit Court of Appeals stated that the court had "taken care to avoid resolving" the question of whether bankruptcy courts are bound to apply the conflicts rules of the forum state. *Woods–Tucker Leasing Corp. of Ga. v. Hutcheson–Ingram Development Co.,* 642 F.2d 744, 748 (5th Cir.1981). Even in that later case, the court left open the possibility that, even if a bankruptcy court is not bound to apply the conflicts rules of the forum state, it may choose to do so when "the issue presents a question that is 'independent of bankruptcy and precedes it,' ... and that should be resolved in a manner that is not inconsistent with the resolution that would have occurred had the bankruptcy proceeding not intervened." *Id.* at 748 n. 8. The Court believes that these claims would fall within those parameters and that using the choice of law principles of the forum state is appropriate in this case.

COT and APX provides for Texas law to apply, APX contends that the Court should look to Texas law to resolve the question of whether payment of APX's attorneys' fees can be shifted from APX to the Debtors. However, the only dispute brought before this Court was a dispute between APX and the Debtors. APX filed a proof of claim based upon the amounts due and owing APX by the Debtors under the MSPA, not under the terms of the contract between APX and ERCOT. The Court is at a loss to understand why a choice of law provision that was bargained for and agreed to by ERCOT and APX should now be employed to saddle the Debtors with a liability that they never intended to undertake. The Debtors and APX bargained for and agreed that California law would govern the interpretation of the MSPA, and this Court respects that choice of law provision. For the same reasons that the Court would respect the parties' choice of law when interpreting the contract, the Court will apply the same law to resolve the issue of whether APX has a statutory claim for attorneys' fees.

■ As discussed above, under California law, APX is not entitled to reimbursement for its attorneys' fees. However, it appears that APX may be entitled to recover its costs, pursuant to Section 1032. As noted above, California law allows for the recovery of costs by a prevailing party. A "'[p]revailing party' includes the party with a net monetary recovery, a defendant in whose favor a dismissal is entered, a defendant where neither plaintiff nor defendant obtains any relief, and a defendant as against those plaintiffs who do not recover any relief against that defendant." CALIF. CODE OF CIV. P. § 1032(a)(4). In this case, APX recovered $3.4 million as a result of filing its various proofs of claim against the Debtors. The Debtors have argued that, because APX originally asserted total claims of $6.6 million, APX cannot be considered a prevailing party. APX counters that the original $6.6 million was based upon amounts that APX estimated to be due to ERCOT on the Debtors' behalf, and that the actual amount owed was in fact the $3.4 million, which APX successfully recovered. Although APX did not recover the full amount of the $6.6 million claims originally filed, the Court finds that the recovery of $3.4 million is a sufficient recovery to support a finding that APX is a prevailing party within the meaning of Section 1032. *See Scott Co. of California v. Blount, Inc.*, 20 Cal.4th 1103, 86 Cal.Rptr.2d 614, 979 P.2d 974 (1999) (holding that the trial court did not abuse its discretion by finding that the plaintiff was a prevailing party despite the fact that the plaintiff originally sought $2 million in damages, but recovered only $440,000).

■ Pursuant to Section 1033.5, "costs" allowable under Section 1032 include "filing, motion, and jury fees"; "[j]uror food and lodging"; "transcribing necessary depositions" and "travel expenses to attend depositions"; costs for "[s]ervice of process by a public officer, registered process server, or other means"; "[e]xpenses of attachment including keeper's fees"; "[p]remiums on necessary surety bonds"; "[o]rdinary witness fees; [f]ees of expert witnesses ordered by the court"; "[t]ranscripts of court proceedings ordered by the court"; "[c]ourt reporters fees as established by statute"; and "[m]odels and blowups of exhibits and photocopies of exhibits may be allowed if they were reasonably helpful to aid the trier of fact." CALIF. CODE OF CIV. P. § 1033.5(a). Specifically not allowed as costs are investigation expenses of preparing for trial, postage, telephone, and photocopying costs, except as

necessary for preparing exhibits. *Id.* § 1033.5(b).

In its application, APX has sought recovery of expenses incurred in the amount of $4,068.47, which includes amounts expended for facsimiles, computer-assisted legal research, photocopies, postage, telephone calls, word processing, travel expenses, taxis, conference expenses, courier services and express mail, and filing fees of $190. There is no evidence within the record to suggest that any of the travel expenses were incurred in connection with attendance of a deposition. Other than the filing fees, which are an item that is specifically included within the definition of costs provided by Section 1033.5, none of these expenses appear to be allowable. Therefore, the Court will award APX an unsecured claim of $190 as reimbursement for its filing fees.

### CONCLUSION

Having carefully considered the matter, the Court finds that the Application of Automated Power Exchange for Payment of Attorneys' Fees and Expenses should be, and hereby is, **DENIED** in part and **GRANTED** in part. Automated Power Exchange shall be entitled to payment of $190.00 as an allowed unsecured claim against the Debtors' bankruptcy estates.

**IT IS SO ORDERED.**