**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In the Matter of: SNTL
CORPORATION; SN INSURANCE
SERVICES, INC.; SNTL HOLDINGS
CORPORATION; SN INSURANCE
ADMINISTRATORS, INC.; INFONET
MANAGEMENT,

*Debtors,*

SNTL CORPORATION; SN INSURANCE
SERVICES, INC.; SNTL HOLDINGS
CORPORATION; SN INSURANCE
ADMINISTRATORS, INC.; INFONET
MANAGEMENT,

*Appellants,*

v.

CENTRE INSURANCE COMPANY,

*Appellee.*

No. 08-60001

BAP
No. CC-06-1350-
MoDK

OPINION

Appeal from the Ninth Circuit
Bankruptcy Appellate Panel
Klein, Montali, and Dunn, Bankruptcy Judges, Presiding

Argued and Submitted
May 6, 2009—Pasadena, California

Filed June 23, 2009

Before: Cynthia Holcomb Hall, Andrew J. Kleinfeld and
Barry G. Silverman, Circuit Judges.

Per Curiam Opinion

7437

## COUNSEL

Iain A.W. Nasatir, Jonathan J. Kim, and Jeremy V. Richards, Pachulski, Stang, Ziehl & Jones LLP, Los Angeles, California, for the appellants.

Christopher E. Prince and Robert B. Millner, Sonnenschein Nath & Rosenthal, LLP, Los Angeles, California and Chicago, Illinois, for the appellee.

## OPINION

Per Curiam:

The Bankruptcy Appellate Panel is AFFIRMED for the reasons stated in its opinion in this case *sub nom*. We adopt the BAP opinion, *In re SNTL Corp.*, 380 B.R. 204 (B.A.P. 9th Cir. 2007), as our own and attach it as an appendix to this opinion. *See* Appendix, *infra*.

## APPENDIX

ORDERED PUBLISHED

# UNITED STATES BANKRUPTCY APPELLATE PANEL FOR THE NINTH CIRCUIT

In re: SNTL CORP.; SN
INSURANCESERVICES, INC.; SNTL
HOLDINGS CORP.; SN INSURANCE
ADMINISTRATORS, INC.; INFONET
MANAGEMENT SYSTEMS, INC.;
PACIFIC INSURANCE BROKERAGE,
INC.,

*Debtors.*

CENTRE INSURANCE COMPANY,
SNTL CORP.;

*Appellant,*

v.

SN INSURANCE SERVICES, INC.;
SNTL HOLDINGS CORP.; SN
INSURANCE ADMINISTRATORS, INC.;
INFONET MANAGEMENT SYSTEMS,
INC.; PACIFIC INSURANCE
BROKERAGE, INC.,

*Appellees.*

BAP No.
CC-06-1350-MoDK

Bk. Nos.
SV 00-14099-GM
SV 00-14100-GM
SV 00-14101-GM
SV 00-14102-GM
SV 02-14236-GM
SV 02-14239-GM
(Jointly
Administered)

OPINION

Argued and Submitted on September 21, 2007
at Pasadena, California

Filed — December 19, 2007

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Geraldine Mund, Bankruptcy Judge, Presiding

Before: MONTALI, DUNN and KLEIN, Bankruptcy
Judges.

MONTALI, Bankruptcy Judge:

In this complicated and high-stakes case, we apply a some-
what obscure doctrine that involves the intersection of insol-
vency law principles and guaranty law, illustrating the
temporal nature of a release of a guarantor when a voidable
preference is recovered from the obligee. We also will be one
of the first courts to address a question left unanswered by the
Supreme Court earlier this year: May an unsecured creditor
include attorneys' fees incurred postpetition but arising from
a prepetition contract as part of its unsecured claim?

Here a creditor contended that the debtor's previously
released liability as a guarantor of an affiliate's obligation was
revived when the creditor compromised a preference action
against it. The bankruptcy court disagreed and entered sum-
mary judgment disallowing the creditor's multimillion dollar
claim and denying the creditor's request for postpetition attor-
neys' fees and costs. The creditor appeals, and we REVERSE
and REMAND.

## I.  FACTS

A.  *The Parties*

On April 26, 2000 (the "petition date"), SNTL Corporation
(formerly known as Superior National Insurance Group)[1] and

---

[1]SNTL Corporation is the post-confirmation successor to Superior
National Insurance Group and will be referred to as "SNIG" in this opin-
ion.

its non-insurer affiliates SN Insurance Services, Inc., SNTL Holdings Corporation (formerly known as Business Insurance Group, Inc.), and SN Insurance Administrators, Inc. (collectively, "Debtors") each filed chapter 11 petitions[2] for relief.

Pursuant to a confirmed joint plan of reorganization ("Plan"), an SNTL Litigation Trust ("Trust") was formed and an SNTL Litigation Trustee ("Trustee") was appointed. The Trustee was authorized to prosecute certain claims, rights and causes of actions and to oversee and initiate actions pertaining to the allowance and payment of claims, including objections to proofs of claims.

Appellant Centre Insurance Company ("Centre") filed a proof of claim in November 2000 asserting a claim in excess of $294,488,911 (including approximately $3 million in attorneys' fees but not including contingent and unliquidated amounts) and an amended proof of claim in March 2005 in the amount of $232,748,280.40. The Trustee filed an objection to Centre's claim arguing, *inter alia*, that Centre had released claims against SNIG prepetition, that the released claims could not be revived by postpetition events and that Centre, as an unsecured creditor, could not include in its claim attorneys' fees incurred postpetition.

B.   *Pertinent Transactions and Events*

The relationship of the parties, and the nature of the transactions summarized below, are complex and perhaps unique to the insurance and reinsurance industry. Reduced to their central elements, however, they can be summarized as follows: Debtor SNIG guaranteed the performance of its affili-

---

[2]Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9036, as enacted and promulgated prior to the effective date of The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. 109-8, 119 Stat. 23 (Apr. 20, 2005).

ates' obligations to Centre. Following default on these obligations, the parties reached an agreement whereby the affiliates paid Centre $163.4 million to satisfy an obligation of $180 million and Centre simultaneously released the guarantor (SNIG). Thereafter, in settlement of a preference action brought by the liquidator of the affiliate insurance companies, Centre returned a portion of the $163.4 million payment. Centre now seeks to recover the returned amount ($110 million) from the guarantor SNIG; Trustee asserts that SNIG's released liability cannot be revived.

More specifically, on December 18, 1998, SNIG sold its affiliate Business Insurance Company ("BICO") to Centre Solutions Holdings (Delaware Limited) ("Centre Solutions"); BICO became known as Centre. On the same day, Centre entered into certain reinsurance agreements (the "LPT and Quota Share Agreements") with insurance companies affiliated with SNIG: California Compensation Insurance Company ("CalComp") and Superior National Insurance Company ("SNIC"). SNIG guaranteed performance of one of these reinsurance agreements known as the "QSR Contract."

In addition, the parties also entered into fronting (service) agreements known as the Underwriting Management Agreement ("UMA") and the Claims Administration Services Agreement ("CSA"). SNIG also guaranteed performance of these agreements. The UMA, CSA, LPT and Quota Share Agreements are collectively referred to as the "Fronting Agreements."[3] The Fronting Agreements provide for the recovery of all reasonable expenses, including attorney's fees, incurred in the enforcement of SNIG's guaranty.

---

[3]The Fronting Agreements provide for the recovery of all reasonable expenses, including attorneys' fees, incurred in the enforcement of SNIG's guaranty. Under the Fronting Agreements, SNIG sold insurance policies using Centre's name and "A" financial rating. SNIG marketed, underwrote and administered the policies, and received the premiums and paid the claims arising under them. Centre received a fee for the use of its name and financial rating.

The Fronting Agreements were breached in late 1999. On December 31, 1999, Centre entered into a Partial Commutation and Settlement Agreement ("PCSA") with CalComp, SNIC and SNIG. The PCSA modified the Fronting Agreements and provided for a partial release of the reinsurance obligations of SNIG, CalComp, SNIC and all of their parents and affiliates (among others) up to $180 million (the "Release").[4]

In exchange for the Release, SNIG, CalComp and SNIC agreed to meet six conditions, including payment of a $163.4 million Partial Commutation Payment ("Payment") by Cal-Comp and SNIC. Centre received the Payment; no evidence was introduced that any of the six conditions for the Release were unsatisfied. In its opening brief, Centre acknowledges that "the primary obligors and SN Holdings [SNIG] (the guarantor) were released from liability for up to $180 million" in exchange for the Payment. *Appellant's Opening Brief* at 13. Consequently, the Release in the PCSA became effective prepetition.

---

[4]The Release provided in pertinent part:

> Subject to receipt of the Commutation Payment, [Centre] does hereby release and forever discharge the Reinsurers, their predecessors, successors, parents, affiliates, agents, officers, directors and shareholders and assigns from any and all past, present and future payment obligations, adjustments, executions, offsets, actions, causes of action, suits, debts, sums of money, accounts, reckonings, bonds, bills, covenants, contracts, controversies, agreements, promises, damages, judgments, claims, demands, liabilities and/or losses whatsoever, all whether known or unknown, which [Centre] and their successors and assigns ever had, now have, or hereinafter may have, whether grounded in law or equity relating, directly or indirectly, to the terms and conditions of the LPT and Quota Share Agreements . . . .

*PCSA* at 3. In addition, Article III of the PCSA excepted from the Release claims exceeding $180 million, stating that the LPT and Quota Share Agreements remained in full force and effect "with respect to the cession of Losses, Loss Adjustment Expenses and unearned premium reserves, in excess of $180,000,000." *Id.*

Article X of the PCSA provided that the Release could be revoked by Centre if the PCA or other payments made pursuant to the PCSA were found to be voidable or preferential transfers, stating in pertinent part:

> In the event that any court of competent jurisdiction or governmental or regulatory authority asserting jurisdiction over the subject matter hereof or the parties hereto enters a final order, judgment, or other finding that: (i) the payment of all or any part of the $22,300,000, described above, or (ii) the payment by Reinsurers of all or any part of the [Payment] of $163,400,000, or (iii) any of the consideration described in the Recitals to this Agreement . . . constitutes a voidable or preferential transfer, such payment constitutes an improper or disproportionate payment, or the payment is otherwise in violation of law or subject to a claim or [sic] preference, then [Centre] may in its sole discretion, in addition to any other remedy provided by law, equity, statute, or contract: (a) enforce this Agreement according to its express terms and conditions; or (b) declare this Agreement to be null and void in its entirety, and thereupon enforce the terms and conditions of the LPT and Quota Share Agreements as though this Agreement (including without limitation the releases and discharges set forth in Articles III and IV) had not been executed . . . .

*PCSA* at 8-9.

In March 2000, the Insurance Commissioner for the State of California (the "Commissioner") placed certain insurance companies affiliated with Debtors into conservation, followed by liquidation. In January 2002 (approximately fourteen months after the petition date), the Commissioner filed a complaint in state court against Centre and others, seeking in part

the return of the Payment from Centre as an avoidable prefer-
ence under state law preference provisions.

Centre subsequently agreed to settle that state court litiga-
tion, and on February 17, 2005, the state court entered an
order approving a settlement agreement between the Commis-
sioner and Centre (among others) providing that the Commis-
sioner's avoidance action would be dismissed in exchange for
Centre's partial return (in the amount of $110 million) of the
Payment. Paragraph F of the state court order indicated that
the Commissioner sought to recover property transferred by
the insurance companies to Centre and that the Commissioner
had sought avoidance of such transfers.[5]

The order also provided that the settlement agreement
between the Commissioner and Centre was "fully and finally
approved." In turn, the settlement agreement itself provided
that "[t]he payments to the Liquidator under section III.C.1 of
this Settlement Agreement are payments on account of the
claims of the Liquidator arising from payments asserted to be
preferential transfers . . . and not payments on account of any
tort claims." *Settlement Agreement and Mutual Release* at 15.

In its initial proof of claim filed in November 2000, Centre
stated that SNIG's liability as guarantor was for amounts "in
excess of $180,000,000" and reserved the right to seek addi-
tional amounts if any portion of the Payment was "deemed
void or avoidable," specifically mentioning the then-pending
avoidance action by the Commissioner. The amended proof of

---

[5]Paragraph F provided: "The property that the Liquidator [Commis-
sioner] seeks to recover in the Action (including, without limitation, the
property which is the subject of each claim in the Action seeking the
avoidance of a transfer of property) is property of one or more of the SNI-
CIL [Superior National Insurance Company, Superior Pacific Casualty
Company, California Compensation Insurance Company, Commercial
Compensation Casualty Company, and Combined Benefits Insurance
Company], which property was transferred to CIC [Centre] (or, in certain
instances, certain other defendants) from one or more of the SNICIL."

claim does not specifically mention the avoidance action or its effect on the Release, but as will be shown, the battle is all about Centre's contention that the amended claim can include the amount paid to the Commissioner as well as postpetition attorneys' fees.

Trustee objected to Centre's claim and amended claim on many grounds, although only four are relevant to this appeal: (1) Centre's claim arising from SNIG's guaranty obligations had been released and could not be revived as Centre had not obtained a judicial finding or judgment that the Payment (or other payment made under the PCSA) constituted a preferential transfer as required by Article X of the PCSA, (2) even if Centre had obtained such a judicial finding or judgment, it has not exercised its right of revocation and no other remedy is available, (3) Centre's claim arising from SNIG's guaranty obligations was not contingent but was instead extinguished prepetition under the Release and, under section 502(b), could not be revived by any postpetition determination that the Payment was a preference, and (4) Centre was an unsecured creditor and thus could not assert a claim for attorneys' fees incurred postpetition.

In April 2006, Trustee filed a motion for partial summary judgment that the Release extinguished SNIG's liability as guarantor, at least up to $180 million, and that Centre could not recover attorneys' fees incurred postpetition. After conducting a hearing, the bankruptcy court entered a memorandum and order on August 22, 2006, granting the motion on both grounds. The court held that the Release became effective prepetition and Centre did not invoke its power of revocation under Article X prior to the petition date. "Therefore, as of the petition date, the only claim Centre could have had against SNIG is above $180 million."[6] *Memorandum of Opinion* at pages 12-13.

---

[6]The bankruptcy court noted that Centre was not seeking to nullify the PCSA under subsections (a) through (d) of Article X, but was instead

On August 31, 2006, the bankruptcy court entered an order approving a stipulation granting Centre an extension of time to September 21 to file a notice of appeal. Centre thereafter filed its timely notice of appeal.

On December 19, 2006, the clerk of this panel issued an order requiring Centre to (1) explain how the order was final, (2) move for leave to file an interlocutory appeal, or (3) obtain a certification of finality from the bankruptcy court pursuant to Federal Rule of Civil Procedure ("FRCP") 54(b) (made applicable by Rules 7054 and 9014). The bankruptcy court entered its order directing entry of final judgment pursuant to FRCP 54(b) on February 14, 2007, and the panel entered an order on April 23, 2007, treating the order on appeal as final.

## II. ISSUES

(1) Did the Release under the PCSA irrevocably extinguish Centre's claim against SNIG up to $180 million or was SNIG's liability revived to the extent of $110 million upon Centre's payment of that amount to the Commissioner?

> (a) Has a finding or final order triggering the remedies set forth in Article X been made or entered?

---

attempting to exercise its rights in accordance with "any other remedy provided by law, equity, statute, or contract." *Memorandum of Opinion* at 7. The court held that any such remedy arose postpetition and thus was unavailable to Centre. "Centre's postpetition attempt to exercise any remedies it may be entitled to under [Article] X is beyond the scope of this memorandum because no legal theory exists (and Centre has been unable to articulate one) where the postpetition exercise of remedies by Centre would somehow impact the prepetition release." *Id.* at 13. Specifically, the court rejected Centre's argument that it held a prepetition contingent claim against SNIG and that there was a failure of consideration for the release. We disagree with the bankruptcy court's conclusion that Centre does not hold an allowable contingent claim under section 502(b), as explained later in this opinion.

(b) If so, is any remedy available to Centre under which SNIG's liability could be revived?

(c) If the triggering event has occurred and a remedy is available at law, does section 502(b) nonetheless preclude allowance of Centre's claim?

(2) Can Centre, as an unsecured creditor, include in its proof of claim attorneys' fees arising from a prepetition contract but incurred postpetition?

## III.  STANDARD OF REVIEW

We review *de novo* the bankruptcy court's grant of summary judgment. *Marshack v. Orange Comm'l Credit (In re Nat'l Lumber & Supply, Inc.)*, 184 B.R. 74, 77 (9th Cir. BAP 1995); *Mordy v. Chemcarb, Inc. (In re Food Catering & Housing, Inc.)*, 971 F.2d 396, 397 (9th Cir. 1992). In reviewing a summary judgment, the task of an appellate court is the same as a trial court under FRCP 56 (made applicable by Rule 7056). *Hifai v. Shell Oil Co.*, 704 F.2d 1425, 1428 (9th Cir. 1983); *Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch)*, 237 B.R. 160, 165 (9th Cir. BAP 1999). Viewing the evidence in the light most favorable to the non-moving party, we must determine for ourselves whether there was no genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. *Hifai*, 704 F.2d at 1428; *see* FRCP 56(c).

## IV.  JURISDICTION

Pursuant to 28 U.S.C. § 157(b)(2)(B), the bankruptcy court had jurisdiction over the allowance or disallowance of Centre's claim. As the bankruptcy court certified its order disallowing a portion of the claim as final under FRCP 54(b) and

this panel has determined that the appeal is final, we have jurisdiction over the appeal under 28 U.S.C. § 158.

## V.   DISCUSSION

### A.   *The Release Did Not Irrevocably Extinguish Centre's Claim Against SNIG*

Trustee contends Centre cannot invoke its Article X remedies in the absence of a final order, judgment, or other finding that the Payment was subject to a preference claim. Trustee further argues that even if the triggering event (the entry of such an order) had occurred, Centre is not seeking any relief or remedy available under Article X. Finally, Trustee asserts that even if the triggering event had occurred and Centre were seeking relief available under Article X, Centre could not obtain such relief because section 502(b) does not allow claims arising postpetition. The bankruptcy court did not address the first two arguments, as it agreed with Trustee's third argument: Centre's claim was not allowable because it was based on postpetition actions to revive a debt that was released prepetition. On *de novo* review, we are not persuaded by any of the Trustee's arguments.

### 1.   The "Triggering Event" Under Article X Has Occurred

Centre contends that when it paid $110 million in settlement of the Commissioner's preference action against it, SNIG's obligations as guarantor were restored in that amount. Centre does not seek to revive the entire amount of the original guaranty. Article X of the PCSA requires a court finding or judgment that the payments made under the PCSA were preferential before Centre could exercise the remedies available to it under that section.[7] Article X states that if any court

---

[7] As the bankruptcy court stated in its Memorandum of Opinion, Centre is not attempting to revoke the Release or declare it null and void under

of competent jurisdiction asserting jurisdiction over the subject matter of or the parties to the PCSA[8] "*enters a final order*, judgment, or other finding *that . . . a payment* under the PCSA] . . . constitutes a voidable or preferential transfer, . . . an improper or disproportionate payment . . . or *is* otherwise in violation of law or *subject to a claim or preference*," Centre may declare the PCSA null and void or exercise "*any other remedy provided by law, equity, statute or contract*[.]" *PCSA*, Article X (emphasis added). According to Trustee, Centre has not obtained such a court finding or judgment, and thus Centre cannot overcome the release of SNIG.

We disagree. The state court order approving the settlement agreement between the Commissioner and Centre satisfies Article X's requirement for a court order or finding. Paragraph F of the order indicated that the Commissioner was attempting to avoid the transfers and the order provided that the settlement agreement was "fully and finally approved." The settlement agreement which was fully approved specifically stated that the payments by Centre to the Commissioner "are payments on account of the claims of the Liquidator [Commissioner] arising from payments asserted to be preferential transfers." The state court order thus constituted an order or finding that the PCSA payment was subject to a preference claim. As a consequence, Article X and its remedies govern and supersede the release provisions of Article III.[9]

subsections (a)-(d) of Article X. Rather, it is invoking its other remedies provided by law or equity which become available under Article X upon entry of a court order or finding that the Payment was subject to a preference claim.

[8]Neither party disputes that the state court had jurisdiction as contemplated by Article X.

[9]As acknowledged by Centre in its opening brief, the primary obligors and SNIG "as guarantor" were "released from liability for up to $180 million" when the $163.4 payment was made to Centre under the PCSA. *Appellant's Opening Brief* at 13. Despite this admission, Centre notes on page 17 of its Opening Brief that the Release did not mention SNIG as

That order acknowledges that the Payment was subject to the Commissioner's preference claim. Therefore, Centre is entitled to invoke those remedies available to it under Article X.

## 2. Centre's Return of $110 Million to the Commissioner in Settlement of a Preference Claim Revived Its Guaranty Claim Against SNIG

Article X of the PCSA, entitled "Voidable Transfers," governs the rights of Centre in the event payments made pursuant to the PCSA constituted preferential transfers. Upon entry of the requisite court order or finding, Centre may exercise "*any other remedy provided by law, equity, statute or contract*[.]" *PCSA*, Article X (emphasis added). In other words, because the state court's order was the type of court order contemplated by Article X, it triggered whatever remedies Centre had at law as a result of the return of the PCSA payment.

Centre argues that under applicable law, SNIG's guaranty obligation was revived upon and to the extent of the return of the PCSA Payment. While we located no Ninth Circuit or California case precisely on point, we agree that the return of a preferential payment by a creditor generally revives the liability of a guarantor.

As the Tenth Circuit has observed (in dicta), courts "have recognized, without regard to any special guaranty language, that guarantors must make good on their guaranties following avoidance of payments previously made by their principal debtors." *Lowrey v. Mfrs. Hanover Leasing Corp. (In re Robinson Drilling, Inc.)*, 6 F.3d 701, 704 (10th Cir. 1993). "Al-

---

guarantor. This omission is irrelevant. The Release applies to all parents and affiliates of the primary obligors, for all liabilities or debts whatsoever. *PCSA*, Article III. Recital 3 of the PCSA states that the "Guarantor" [SNIG], the primary obligors (the reinsurers) and Centre wish "to fully and finally to [sic] settle and determine their respective obligations and liabilities." *PCSA*, Recital 3.

though a surety usually is discharged by payment of the debt, he continues to be liable if the payment constitutes a preference under bankruptcy law. A preferential payment is deemed by law to be no payment at all." *Herman Cantor Corp. v. Cent. Fidelity Bank (In re Herman Cantor Corp.)*, 15 B.R. 747, 750 (Bankr. E.D. Va. 1981).

The *Restatement (Third) of Suretyship and Guaranty* and the *Corpus Juris Secundum* on *Principal and Surety* echo these general principles.

> When a secondary obligation is discharged in whole or part by performance by the principal obligor or another secondary obligor, or by realization upon collateral securing such performance, the secondary obligation revives to the extent that the obligee, under a legal duty to do so, later surrenders that performance or collateral, or the value thereof, as a preference or otherwise.

*Restatement (Third) of Suretyship & Guaranty* § 70 (1996). Similarly, the *Corpus Juris Secundum* provides that if a creditor is forced to refund a payment to a primary obligor, the guarantor's liability is revived:

> [T]o discharge the surety, the payment of the principal debt or obligation must be valid and binding, and, if the creditor is forced to refund the payment, the surety's liability is restored. Thus, a surety is not, as a general rule, released by a payment that is a preference under the bankruptcy laws, which the creditor is obliged to refund.

72 C.J.S. *Principal and Surety* § 129 (Updated 2007).

Trustee disputes the applicability of the cases that follow or recognize the general principle, but cites no case law holding the contrary: that the liability of a surety or guarantor is *not*

revived by a return of a preferential transfer to a primary obligor (or its assigns). Rather, Trustee contends that the general principle is inapplicable because, *inter alia*, the repayment of the preference must be involuntary for the principle to apply. Trustee's contention is based on the assumption that a return of a payment is "voluntary" if it was made pursuant to a settlement. We disagree.[10] While *Corpus Juris Secundum* and the *Restatement* do indicate that the repayment must be "forced" or made "under a legal duty to do so," the Sixth Circuit in *Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 408-09 (6th Cir. 2000), held that when the obligee returns a payment as part of a settlement of a preference avoidance action, the guarantor is not discharged of his obligation to pay the debt.

We find *Wallace Hardware* persuasive. In that case, the creditor repossessed inventory of a primary obligor in satisfaction of the obligor's debt. Thereafter, the obligor filed for bankruptcy relief and the trustee filed an action to have the

---

[10]A state appellate court recently tackled the issue of whether a return of a payment pursuant to a settlement constituted a "voluntary" payment outside the scope of the Restatement's revival rule set forth in section 70. Because the case is not published and the local rules of the court prohibit citation to its unpublished decisions, we will not cite it. We nonetheless agree with its reasoned holding.

In that case, like Trustee here, the guarantor argued that its liability on the guaranty was not revived when the creditor "voluntarily" returned the payment to the primary obligor in settlement of a preference action. Like us, the appellate court rejected this argument, stating (emphasis added):

> [T]his argument misconstrues the nature of voluntariness. [The creditor/obligee] did not spontaneously return the money to [the primary obligor]. It responded to a lawsuit, and entered lengthy negotiations with [the primary obligor] before ultimately reaching a settlement. *We do not regard the settlement as uncoerced. A lawsuit necessarily implies a degree of compulsion. A payment made in settlement of contested litigation is not truly voluntary.*

We agree with this analysis of why a return of a payment made in settlement of a lawsuit is not "voluntary" and of why the general principles of section 70 of the *Restatement (Third) of Surety & Guaranty* apply here.

repossession avoided as a preference. The creditor settled with the trustee and sued the guarantors for the amount of the debt that remained outstanding upon the creditor's partial return of the proceeds of its inventory repossession.[11]

In holding that the guarantors were obligated to repay the amounts returned by the creditor to the trustee under the preference action settlement, the Sixth Circuit stated that "courts have uniformly held that a payment of a debt that is later set aside as an avoidable preference does not discharge a guarantor of his obligation to repay that debt." *Id.* at 408 (citing cases). The Sixth Circuit also observed that the repossession operated as an accord and satisfaction, and that "an accord and satisfaction, like any contract, can be set aside, in whole or in part, for such reasons as mutual mistake, supervening illegality, or frustration of purpose." *Id.*

Trustee contends that we should disregard *Wallace Hardware* because there the obligations of the guarantors, unlike those of SNIG, had not been contractually released by the creditor. This distinction is not significant because while Article III of the PCSA did release SNIG, Article X provided Centre with whatever remedies were available in law upon entry of the requisite court order or finding. As we have already held, the triggering event of Article X's remedies occurred when the state court entered the order approving the settlement agreement. As one of the remedies available at law permits revival of otherwise released guaranty obligations upon return of a preferential payment of the primary obligor, the remedies available under Article X and under law supersede the release provisions of Article III.

---

[11]In *Wallace Hardware*, the payment made by the primary obligor was attacked under the Bankruptcy Code's preference provisions, while the Payment here was alleged to be preferential under California's Insurance Code. Nonetheless, the general principle — that the return of a preferential payment of a primary obligor by the obligee revives a guarantor's obligation otherwise released by that payment — should operate with equal force whatever preference law applies.

Thus, Trustee's reliance on Article III's Release in an effort to distinguish *Wallace Hardware* and the other cases is not convincing, particularly because Trustee's position (unlike that of *Wallace Hardware*) would discourage settlement of preference litigation.[12] It would be a strange result, indeed, if we were to require Centre to litigate with the Commissioner to the bitter end, lose, then satisfy a judgment of at least $163.4 million before it could revive SNIG's guaranty obligation, particularly where Article X itself requires merely a finding that the Payment was subject to a preference claim. Instead, we find *Wallace Hardware's* position more persuasive because it does not require full and costly litigation but instead acknowledges that the general principle should also apply when the creditor returns at least a portion of a primary obligor's payment in settlement of a preference action.

### 3.   Section 502(b) Does Not Preclude Allowance of Centre's Claim

Trustee argues that even if Centre's claim against SNIG could be revived under Article X and applicable law, the release of Article III was still in effect as of its petition date and thus Centre's claim was extinguished prepetition and not allowable under section 502(b). In other words, the claim could not be revived postpetition, even if the PCSA and other governing law permitted revival outside of bankruptcy. The bankruptcy court agreed with Trustee, holding that Centre was attempting to invoke postpetition remedies and thus asserting postpetition claims. We hold, however, that Centre held a prepetition contingent claim inasmuch as the guaranty claim was subject to revival once the state court conservatorship had begun prepetition, giving rise to a possible (and foreseen) preference action by the Commissioner.

---

[12]Trustee has not suggested that Centre could have defeated the Commissioner's state court action or that the settlement was inappropriate.

Section 502(b) provides that a court is to determine the amount of a prepetition claim "as of the date of the filing of the petition, and . . . allow such claim in such amount." The bankruptcy court agreed, concluding because Centre's claims against SNIG had been released and extinguished as of the petition date, its claim was disallowed, and section 502(b) precluded Centre from relying on postpetition events to revive the claim. Centre argues that its claim for recovery of any preferential payments it made postpetition constitutes an allowable contingent claim under section 502(b). We agree; Centre's claim should not be disallowed merely because the removal of the contingency affecting its claim will occur post-petition, a consequence that is plainly at odds with the Bankruptcy Code.

A claim is broadly defined under the Bankruptcy Code. It includes a right to payment or equitable remedy "whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, *contingent*, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5) (emphasis added). The Code utilizes this "broadest possible definition" of claim to ensure that "all legal obligations of the debtor, *no matter how remote or contingent*, will be able to be dealt with in the bankruptcy case." *Cal. Dep't of Health Servs. v. Jensen (In re Jensen)*, 995 F.2d 925, 929-30 (9th Cir. 1993) (emphasis in original) (citations and quotations omitted).

Section 502(b)(1) provides that a claim is not allowable if it is unenforceable under the applicable agreement or law "*for a reason other than because such claim is contingent or unmatured.*" 11 U.S.C. § 502(b)(1) (emphasis added). Here, the parties provided in Article X remedies for Centre in the event a court entered an order or finding that the Payment was subject to a preference claim. Upon the occurrence of that contingency or triggering event, Centre would have certain rights and claims against SNIG. Under section 502(b)(1), those contingent claims cannot be disallowed simply because

the contingency occurred postpetition.[13] As we stated in a recent decision, we "must find a basis in section 502 to disallow a claim, and absent such basis, we must allow it." *Wells Fargo Fin. Acceptance v. Rodriguez (In re Rodriguez)*, 375 B.R. 535, 545 (9th Cir. BAP 2007), citing *Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*, ___ U.S. ___, 127 S.Ct. 1199, 1206 (2007) ("we generally presume that claims enforceable under applicable state law will be allowed in bankruptcy unless they are expressly disallowed" under section 502). Contingent claims are allowed under section 502(b).

Moreover, as the parties concede, federal law determines when a claim arises under the Bankruptcy Code. *Zilog, Inc. v. Corning (In re Zilog, Inc.)*, 450 F.3d 996, 1000 (9th Cir. 2006). "It is well-established that a claim is ripe as an allowable claim in a bankruptcy proceeding even if it is a cause of

---

[13]If SNIG had filed bankruptcy before the primary obligors had defaulted on the Fronting Agreements and QSR Contract, Centre would hold a claim against SNIG even though SNIG's liability was contingent on the primary obligors' future postpetition default. *See In re All Media Props., Inc.*, 5 B.R. 126, 133 (Bankr. S.D. Tex. 1980), *aff'd*, 646 F.2d 193 (5th Cir. 1981) ("[I]n the case of the classic contingent liability of a guarantor of a promissory note executed by a third party, both the creditor and guarantor knew that there would be liability only if the principal defaulted. No obligation arises until such default."). Similarly, here, the parties knew that Centre's remedies against SNIG under Article X would not be available until the occurrence of a contingent, triggering event: the entry of a court order or finding that the Payment was subject to a preference claim.

Another subsection of section 502 demonstrates that Congress did not intend for claims to be disallowed simply because of their contingent nature. Section 502(c)(1) establishes a procedure for the estimation of such claims by the bankruptcy court. Even though such claims could not be enforced on the petition date outside the bankruptcy court, the Bankruptcy Code clearly contemplates that the bankruptcy estate will deal with contingent and unliquidated claims, including contingent or unliquidated guaranty claims against debtors. *In re Tiegen*, 228 B.R. 720, 722-23 (Bankr. D. S.D. 1998) (estimating claims of holders of guaranties executed by chapter 7 debtors).

action that has not yet accrued." *Cool Fuel, Inc. v. Bd. of Equalization (In re Cool Fuel, Inc.)*, 210 F.3d 999, 1007 (9th Cir. 2000). The Ninth Circuit has adopted the "fair contemplation" test for determining when a claim accrues for the purposes of section 502(b). *Zilog*, 450 F.3d at 1000; *Cool Fuel*, 210 F.3d at 1007; *Jensen*, 995 F.2d at 930. Under that test, a claim arises when a claimant can fairly or reasonably contemplate the claim's existence even if a cause of action has not yet accrued under nonbankruptcy law. *Cool Fuel*, 210 F.3d at 1007.

Here, the parties contemplated that Centre could have a claim against SNIG in the event a payment made by the primary obligors under the PCSA constituted a preferential transfer. Article X was drafted to cover that contingency. The Debtors filed their respective chapter 11 petitions after the Commissioner placed the primary obligors into conservation. As the conservation was commenced approximately three months after the PCSA payments were made, an action by the Commissioner to recover those payments as preferential could have been reasonably and fairly contemplated by SNIG and Centre as of the petition date. *See* Cal. Ins. Code § 1034(c)(1) (transfers made within four months before filing of the liquidation/conservation petition are avoidable). Consequently, those claims accrued (even if they were contingent and not fixed) as of the petition date, even if the Release were still effective as of that date.

Hence, because Centre's claim based on a revival of SNIG's guaranty was an allowable claim as of the date of the petition, we will reverse.

B. *Centre May Be Entitled to Add Its Postpetition Attorneys' Fees To Its Unsecured Claim*

This appeal presents a question currently pending before the Ninth Circuit: May an unsecured creditor include attorneys' fees incurred postpetition as part of its unsecured claim?

In *Travelers*, the Supreme Court did not resolve this issue but instead remanded it to the Ninth Circuit for resolution. *Travelers*, 127 S.Ct. at 1207-08. Rather than delay this appeal to await that outcome, we will answer the question ourselves.[14]

In *Travelers*, the bankruptcy court had followed the Ninth Circuit's holding in *Fobian v. W. Farm. Credit Bank (In re Fobian)*, 951 F.2d 1149 (9th Cir. 1992), that creditors could not recover attorneys' fees for litigating issues particular to bankruptcy law and disallowed the claim for such fees by Travelers. The district court and the Ninth Circuit affirmed. The Supreme Court reversed to the extent the claim was disallowed on this ground, overruling *Fobian*. It specifically refused, however, to decide whether Travelers' claim for post-petition attorneys' fees was disallowed under section 502(b)(1) because of Travelers' status as an unsecured creditor. *Travelers*, 127 S.Ct. at 1207-08.

Since *Travelers* was issued by the Supreme Court, two bankruptcy courts have disagreed on the issue of whether an unsecured creditor can recover fees incurred postpetition, with a split result.[15] *Compare Qmect, Inc. v. Burlingame Capital Partners II, LP (In re Qmect, Inc.)*, 368 B.R. 882 (Bankr. N.D. Cal. 2007) (unsecured creditor was entitled to include its contract-based attorneys' fees incurred postpetition in its pre-

---

[14]First, we owe it to the parties to decide cases before us promptly. Second, our decision is subject to review by the Ninth Circuit. Third, we believe the Ninth Circuit values the views of the Bankruptcy Appellate Panel on bankruptcy issues. *Sigma Micro Corp. v. Healthcentral.com (In re Healthcentral.com)*, 504 F.3d 775, 784 n.3 (9th Cir. 2007).

[15]In addition, the First Circuit issued a post-*Travelers* opinion that favorably cited authority supporting the allowance of postpetition attorneys' fees to unsecured creditors, but that decision is not on point. *UPS Capital Bus. Credit v. Gencardelli (In re Gencardelli)*, 501 F.3d 1, 6 (1st Cir. 2007). The *Gencardelli* court was not addressing the issue of postpetition attorneys' fees but instead held that an oversecured creditor was entitled to collect a prepayment penalty from a solvent debtor regardless of reasonableness.

petition claim) to *In re Elec. Mach. Enter., Inc.*, 371 B.R. 549 (Bankr. M.D. Fla. 2007) (disallowing unsecured creditor's postpetition attorneys' fees).

The split is unsurprising, as the cases decided prior to *Travelers* also reached opposite conclusions, with the majority holding that unsecured creditors could not assert attorneys' fees incurred postpetition as part of their claims.[16] While the holdings may diverge, these cases analyze the four primary arguments asserted in favor of and against the allowance of such claims: whether section 506(b) operates to disallow such claims; whether section 502(b) disallows such claims because they were not fixed "as of the date of the filing of the petition;" whether the Supreme Court's decision in *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd*, 484 U.S. 365 (1988), precludes allowance of such claims; and whether public policy favors disallowance of such claims. We address each argument in turn.

---

[16]In the majority line of cases, courts have held that unsecured creditors are not entitled to claim such fees, as section 506(b) is the only provision in the Code that permits the recovery of postpetition fees from the estate, and that section applies only to secured creditors. *See Adams v. Zimmerman*, 73 F.3d 1164, 1177 (1st Cir. 1996); *Waterman v. Ditto (In re Waterman)*, 248 B.R. 567, 573 (8th Cir. BAP 2000); *Pride Cos., L.P. v. Johnson (In re Pride Cos., L.P.)*, 285 B.R. 366, 372-73 (Bankr. N.D. Tex. 2002) (collecting cases).

In the sizable minority line of cases, courts have permitted unsecured creditors to claim attorneys' fees incurred postpetition but based on a prepetition contract. *See Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1168 (6th Cir. 1985); *United Merchs. & Mfrs. Inc. v. Equitable Life Assurance Soc'y of the U.S. (In re United Merchs. & Mfrs. Inc.)*, 674 F.2d 134 (2d Cir. 1982) (decided under the former Bankruptcy Act, but commenting on section 506(b) of the current Code); *In re New Power Co.*, 313 B.R. 496 (Bankr. N.D. Ga. 2004); *but see Pride Cos.*, 285 B.R. at 374 (listing the "sizable minority" cases decided before 2002).

### 1.   Section 502 vs. Section 506

In *Electric Machinery*, as in almost all of the cases in the majority line, the court held that unsecured creditors cannot recover postpetition fees because the "plain language" of section 506(b) precludes such claims:

> The emphasized language of section 506(b) demonstrates the congressional intent to create an exception to the general rule that claims are to be determined as of the petition date, exclusive of post-petition interest, attorneys' fees, and other charges. The use of the words "to the extent" a claim is oversecured, and "there shall be allowed" interest and fees, mandates the conclusion that in all other circumstances, post-petition interest, attorneys' fees, and charges shall not be allowed. These courts have concluded that if Congress intended for unsecured creditors to receive post-petition attorneys' fees, then it would have done so explicitly by authorizing unsecured creditors to collect fees under section 506(b).

*Elec. Mach.*, 371 B.R. at 551, citing *Pride Cos*, 285 B.R. at 372. In contrast, the *Qmect* court rejected the argument that section 506(b) permits only secured creditors to recover post-petition fees:

> The Court finds this reading of 11 U.S.C. §§ 502(b) and 506(b) too strained to be persuasive. First, 11 U.S.C. § 506 is entitled "Determination of Secured Status." A statute so entitled would not be a logical place to provide for the disallowance of an element of an unsecured claim. If Congress, in enacting the Bankruptcy Code, had wanted to disallow claims for post-petition attorneys' fees, the logical place for it to have done so was surely in 11 U.S.C. § 502(b). Moreover, 11 U.S.C. § 506(b) does not distinguish between pre-petition and post-petition attorneys'

fees. Thus, if 11 U.S.C. § 506(b) is read as an additional ground for objecting to claims, arguably, an unsecured creditor would be prohibited from including its pre-petition attorneys' fees in its claim as well as its postpetition fees.

*Qmect*, 368 B.R. at 885.

We are not persuaded by the approach of the *Electric Machinery* court and, like *Qmect*, we reject the argument that section 506(b) preempts postpetition attorneys' fees for all except oversecured creditors. While we cannot predict how the Ninth Circuit will decide this issue in *Travelers*, we do find a clue in *Joseph F. Sanson Inv. Co. v. 268 Ltd. (In re 268 Ltd.)*, 789 F.2d 674, 678 (9th Cir. 1986), where the Ninth Circuit observed that section 506(b) defines secured claims and does not limit unsecured claims:

When read literally, subsection (b) arguably limits the fees available to the oversecured creditor. When read in conjunction with § 506(a), however, it may be understood to define the portion of the fees which shall be afforded secured status. We adopt the latter reading.

*268 Ltd.*, 789 F.2d at 678.

In *268 Limited*, an oversecured creditor sought postpetition attorneys' fees based on its contract with the debtor, which provided that the creditor could recover five percent of the balance due at the time of default as attorneys' fees. *Id.* at 675. The creditor argued that because Nevada law permitted recovery of fees on such a percentage basis, the fees were reasonable and allowable under section 506(b) as a matter of law. *Id.* The Ninth Circuit disagreed, holding that section 506(b) permitted the creditor to claim as secured only its "reasonable" fees and that the percentage recovery was unreasonable. *Id.* at 675-77. The Ninth Circuit then remanded to allow

the creditor to claim those attorneys' fees exceeding the "reasonable" amount as an unsecured claim under section 502(b)(1). The court noted that "other creditors may claim such expenses" under that section and that section 506(b) does not "limit the fees available" as an unsecured claim but merely "define[s] the portion of the fees which shall be afforded secured status."[17] *Id.* at 678.

We agree with the Ninth Circuit, as well as with the Eleventh Circuit in *Welzel v. Advocate Realty Inv., LLC (In re Welzel)*, 275 F.3d 1308, 1316-20 (11th Cir. 2001), that the allowance functions of section 506(b) and 502(b) have been incorrectly conflated. Section 502(b), which applies to claims generally, does disallow unmatured interest (*see* 11 U.S.C. § 502(b)(2)); it does not specifically disallow attorneys' fees of creditors or certain other charges. Section 506(b), on the other hand, specifies what may be included in a secured claim.

---

[17]While the Ninth Circuit in *268 Limited* distinguished the allowability of claims under section 502(b)(1) (which incorporates "applicable law" and is silent about "reasonableness") from the definition of secured claim under section 506, it is important to note that its determination that an unsecured claim may be asserted for the amount of fees in excess of the amount that was "reasonable" under section 506(b) does not mean that the claim necessarily had to be allowed. Rather, the court of appeals remanded to allow the creditor to "seek" the balance of its fees under section 502 and expressed "no opinion on the enforceability under the governing state law of the deed of trust's attorney's fees provision." *268 Ltd.*, 789 F.2d at 678. In other words, the claim would still be subject to objection on the merits based on Nevada law, the precise terms of which were not discussed by the Ninth Circuit (although the contentions of the creditor suggest that Nevada law did not impose a separate reasonableness requirement for recovery of contractual attorneys' fees but instead permitted recovery of such fees on a percentage basis). In this instance, "applicable" California law permits recovery of contractual attorneys' fees only if they are reasonable. *See* CAL. CIV. CODE § 1717. Thus, with respect to California cases, "applicable law" limits postpetition contractual attorney's fees to "reasonable" amounts for the purposes of section 502(b)(1).

Comparing the two provisions, the Ninth and Eleventh Circuits courts have held that a creditor may assert an unsecured claim for fees and costs arising under its contract with the debtor, even though the creditor's claim was not an allowed secured claim under section 506(b). *See Welzel*, 275 F.3d at 1317-18 (contains a thorough analysis of the two sections and their respective roles in the Bankruptcy Code).

> [W]e must determine how to interpret the general instructions concerning allowance and disallowance contained in [section] 502 and the more specific instructions concerning attorney's fees in [section] 506(b) such that the two provisions are rendered consistent. We first note that [section] 506(b) does not state that attorney's fees deemed unreasonable are to be disallowed. In fact, the subsection is completely silent with regard to the allowance/disallowance issue. This silence suggests that [section] 506(b) is meant not to displace the general instructions laid down in [section] 502, but to be read together in a complementary manner.

*Id.* at 1317; *see also In re Tricca*, 196 B.R. 214, 219-20 (Bankr. D. Mass. 1996) ("Section 506(b) is not a provision which concerns itself with claim allowance. Section 506(b) addresses only the question of what is part of an 'allowed secured claim.' Those courts which have examined [section] 506(b) in conjunction with [section] 502 have concluded that [section] 506(b) does not create additional exceptions to the allowance of claims; rather it only provides for the classification of allowed claims as secured or unsecured"); *see also Rodriguez*, 375 B.R. at 545 (section 502, not section 506, governs the allowance or disallowance of unsecured claims).

Therefore, if section 506(b) is — as the Ninth Circuit has hinted — irrelevant to determining the allowability of an unsecured claim, we must look to section 502 to determine allowability. *Travelers*, 127 S.Ct. at 1206; *Rodriguez*, 375

B.R. at 545. As discussed below, section 502(b) does not specifically disallow such fees. *Qmect*, 368 B.R. at 885; *New Power*, 313 B.R. at 509-10.

## 2. Date That The Claim Arose

The *Electric Machinery* court, like the bankruptcy court here and many of the pre-*Travelers* majority courts, disallowed the postpetition fees of an unsecured creditor because section 502(b)(1) provides that a bankruptcy court "shall determine the amount of such claim . . . as of the date of the filing of the petition" and the postpetition fees did not exist as of that date. *Elec. Mach.*, 371 B.R. at 551; *Pride Cos.*, 285 B.R. at 373. Because the amount of fees incurred postpetition cannot be determined or calculated as of the petition date, section 502(b) purportedly precludes their allowance. *Id.* We disagree with this approach, as it is inconsistent with the Bankruptcy Code's broad definition of "claim," which — as discussed previously — includes any right to payment, whether or not that right is contingent and unliquidated. *See* 11 U.S.C. § 101(5)(A); *Qmect*, 368 B.R. at 884.

Here, the parties' execution of a prepetition agreement containing an attorneys' fees provision gives rise to a contingent, unliquidated attorney-fee claim. As the *New Power* court held: "[w]hen a creditor's right to payment for fees exists prepetition, the right to payment constitutes a 'claim,' within the meaning of § 101(5)(A), *albeit* an unliquidated, unmatured claim that may be estimated for purposes of allowance, if necessary, pursuant to § 502(c)."[18] *New Power*, 313 B.R. at 508.

---

[18]To the extent that we hold that fees incurred postpetition but arising out of a prepetition contract or agreement constitute contingent, unliquidated prepetition claims, describing them as "postpetition fees" may be inaccurate. Nonetheless, our use of this term is a shorthand means of describing attorney fees actually incurred postpetition but based on the debtor's prepetition contract. More to the point, the critical events that no doubt relate to a portion of Centre's attorneys fees — the Release, the Payment and the Commissioner's conservation — all occurred prepetition, thus making Centre's claim less remote and less contingent.

"So long as the right to collect the fees existed pre-petition, the fact that the fees were actually incurred during the post-petition period is not relevant to the determination of whether the creditor has an allowable pre-petition claim for the fees."[19] *Id.*; *see also Mfrs. Hanover Trust Co. v. Bartsh (In re Flight Trans. Corp. Sec. Litig.)*, 874 F.2d 576 (indenture trustee had a "right of payment" for attorneys' fees under prepetition contract, and thus had an allowable unsecured claim under section 502(b) even though such fees were unknown as of the petition date).

This approach is consistent with the Ninth Circuit's "fair contemplation" test — which we discussed in more detail earlier — for determining when a claim accrues. Postpetition fees can be fairly contemplated when the parties have provided for them in their contracts and thus are contingent claims as of the petition date. They cannot be disallowed merely because they are contingent. *Qmect*, 368 B.R. at 884. As stated by one leading commentator: "In general, if the creditor incurs the attorneys' fees postpetition in connection with exercising or protecting a prepetition claim that included a right to recover attorneys' fees, the fees will be prepetition in nature, constituting a contingent prepetition obligation that became fixed postpetition when the fees were incurred." 5

[19]In *Keaton v. Boatmen's Bank of Tenn.*, 212 B.R. 587 (E.D. Tenn. 1997), vacated as moot, 145 F.3d 1331 (6th Cir. 1998), the district court engaged in a thorough analysis of whether fees incurred postpetition pursuant to a prepetition claim are disallowable because they were not fixed "as of the date of the filing of the petition." *Keaton*, 212 B.R. at 589-91. Even though the decision was vacated as moot when the creditor abandoned its claim for attorneys' fees (145 F.3d at 1331), we find the analysis of *Keaton* persuasive. Quoting the bankruptcy court with approval, the district court held: "While the representation may have been performed after the petition was filed, [the creditor's] right to collect attorney's fees arose out of the contract and is a prepetition claim." *Keaton*, 212 B.R. at 591. The creditor "had a prepetition right to collect attorneys' fees, *albeit* an unmatured, contingent right; i.e., the right was contingent upon the [creditor] actually incurring attorneys' fees in collecting the debt." *Id.*

*Collier on Bankruptcy* § 553.03[1][i] (15th ed. Updated 2007).

Because we hold that attorneys' fees arising out of a prepetition contract but incurred postpetition fall within the Bankruptcy Code's broad definition of claim, we reject the position of the majority line of cases that section 502(b) precludes such fees.

### 3.  Does *Timbers* Control?

Like many other courts in the majority line, the *Electric Machinery* court concluded that the Supreme Court's holding in *Timbers*, 484 U.S. at 380, mandated disallowance of claims by unsecured creditors for postpetition attorneys' fees:

> In *Timbers*, the Supreme Court concluded that because section 506(b) permitted post-petition interest to be paid only out of an equity cushion, an undersecured creditor who had no such equity cushion fell within the general rule of disallowing post-petition interest. Courts that rely on *Timbers* to disallow post-petition attorneys' fees and costs reason that the rationale applies equally to the disallowance of post-petition attorneys' fees and costs to unsecured or undersecured creditors.

*Elec. Mach.*, 371 B.R. at 551.

We believe that *Electric Machinery's* reliance on *Timbers* is misplaced. *Timbers* provided that an undersecured creditor could not receive postpetition interest on the unsecured portion of its debt. *Timbers*, 484 U.S. at 380. This holding is consistent with section 502(b)(2), which specifically disallows claims for unmatured interest. Inasmuch as section 502(b) does not contain a similar prohibition against attorneys' fees, the comparison between the current issue and that presented in *Timbers* is not persuasive. *New Power*, 313 B.R. at 510

("there is no exception within 502(b) which would prevent the collection of attorneys' fees by a creditor who has a valid nonbankruptcy right to do so" and neither section 506(b) nor *Timbers* bars unsecured creditors from asserting a contractual or statutory claim for attorneys' fees); *see also Gencardelli*, 501 F.3d at 6, n.2 (finding *Timbers* inapposite because postpetition interest is "made unavailable as [an] unsecured claim[ ] by an explicit statutory provision").

## 4. Public Policy

Finally, *Electric Machinery* cites policy reasons why courts should disallow claims by unsecured creditors for postpetition attorneys' fees; in particular, the court opines that disallowance of these claims would promote "equality of distribution" and would prevent individual creditors from utilizing scorched-earth litigation tactics or absorbing an inequitable amount of estate assets. *Elec. Mach.*, 371 B.R. at 551-53. In contrast, the court in *Qmect* identifies a different policy reason for allowance of such claims (i.e., to prevent the unfairness of a debtor recovering such fees while the creditor is prohibited from similar recovery). Because we find that the Bankruptcy Code itself provides the answer to this issue (by not specifically disallowing postpetition fees), we do not attempt to reconcile these policy concerns. In the end, it is the province of Congress to correct statutory dysfunctions and to resolve difficult policy questions embedded in the statute.[20]

---

[20]While there is intuitive appeal to the *Electric Machinery* court's concern that an overactive creditor could unfairly run up fees, several factors reduce the potential for trouble. First, the fee doctrines of many jurisdictions, including the general California attorney's fee doctrine that applies here, impose requirements in the nature of reasonableness. Second, the sections of the Bankruptcy Code that expressly focus on compensation for attorneys generally include limitations premised on reasonableness: *e.g.*, section 303(i)(1)(B) ("reasonable attorney's fee"); section 329(b) ("reasonable value of any such services"); section 330(a) ("reasonable compensation"); section 331 (incorporates section 330); section 502(b)(4) ("reasonable value of such services"); section 503(b)(4) ("reasonable com-

In summary, we agree with the *Qmect* court that claims for postpetition attorneys' fees cannot be disallowed simply because the claim of the creditor is unsecured. Because Centre is entitled to claim postpetition attorneys' fees as part of its unsecured claim under section 502, we remand for the bankruptcy court to determine whether Centre has satisfied the requisites for allowance of that portion of its claim under the relevant contracts and state law.

## VI.  CONCLUSION

For the foregoing reasons, we REVERSE the bankruptcy court's holding that Centre's claim against SNIG up to the amount of $180 million be disallowed and REMAND for allowance of the $110 million paid by Centre to the Commissioner. We further REVERSE the disallowance of Centre's postpetition fees to the extent the disallowance was based solely on Centre's status as an unsecured creditor and REMAND for a determination of whether Centre is entitled to the fees under the relevant contracts or state law or whether other grounds exist (apart from Centre's status as an unsecured creditor) for disallowing the postpetition attorneys' fees claim.

---

pensation"). It is counterintuitive to suppose that a court of equity would fully allow a claim for creditor's unreasonable attorneys' fees in litigating with an attorney who can receive only "reasonable" compensation. Third, economic constraints on creditors exist in the typical bankruptcy case where resources are not available to pay unsecured claims in full; a creditor's extra fees will be fully compensated only in the unusual situations where funds are available to pay 100 percent of claims. Thus, the opportunities for gamesmanship are limited.

PRINTED FOR
ADMINISTRATIVE OFFICE—U.S. COURTS
BY THOMSON REUTERS/WEST—SAN FRANCISCO

The summary, which does not constitute a part of the opinion of the court, is copyrighted
© 2009 Thomson Reuters/West.